Jaryl L. Rencher - #4903
Benjamin K. Lusty - #12159
Cami Schiel-#16941
**RENCHER|ANJEWIERDEN**
460 South 400 East
Salt Lake City, Utah 84111
Telephone: (801) 961-1300
Facsimile: (801) 961-1311
*Attorney for the Defendant*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| EMILY SHARP RAINS, | ) **DEFENDANTS' MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **U.S. District Case No.: 2:20.cv.00520-** |
| WESTMINSTER COLLEGE, a Utah | ) **JNP** |
| corporation, and MELISSA KOERNER, in | ) |
| her official and individual capacities. | ) **District Judge Parrish** |
| | ) |
| Defendants. | ) **Magistrate Daphne A. Oberg** |
| | ) |
| | ) |
| | ) |

All Defendants, by and through counsel, hereby seek summary judgment on all of

Plaintiff's, claims for the reasons stated below.

## **RELIEF REQUESTED**

Defendants request that the Court grant them summary judgment on all of Plaintiff's

claims and dismiss her case entirely, with prejudice. Pursuant to DUCivR56-1(b)(1), Defendants

seek summary judgment on the following specific claims:

- Plaintiff's first cause of action for breach of contract against Westminster;

- Plaintiff's second cause of action for breach of the covenant of good faith and fair

  dealing against Westminster;

1

- Plaintiff's third cause of action for intentional interference with contractual relations against Melissa Koerner;

- Plaintiff's fourth cause of action for gender and religious discrimination and retaliation under Title VII of the Civil Rights Act against Westminster;

- Plaintiff's fifth cause of action for gender and religious discrimination under the Utah Anti-Discrimination Act against Westminster;

- Plaintiff's sixth cause of action for negligent employment, supervision, and retention against Westminster;

- Plaintiff's seventh cause of action for intentional infliction of emotional distress against Westminster and Melissa Koerner;

- Plaintiff's eighth cause of action for defamation against Westminster;

- Plaintiff's ninth cause of action for false light invasion of privacy against Westminster.

## BACKGROUND

Westminster University, formerly known as Westminster College, terminated Plaintiff Emily Rains from her position as an assistant professor of accounting on October 18, 2018 after it learned that a Washington state jury found her liable for breach of the Washington Consumer Protection Act earlier that summer. Rains could only be found liable of violating this act after a demonstration that she had engaged in an unfair or deceptive course of conduct. Highly concerned by this discovery, Westminster determined that continuing to employ Rains posed an unacceptable risk to the college's reputation, particularly as she was responsible for instructing accounting and business students in ethics and fiduciary responsibilities. Rains responded by suing for discrimination on the basis of sex and religion. She also alleges related causes of action

for breach of contract, negligent employment, intentional infliction of emotional distress and defamation, citing as a factual bases for these claims various episodes from her short but turbulent tenure at Westminster. But the heart of her claim is her false perception that her termination was outrageous, unjust, and discriminatory.

Summary judgment is appropriate. Westminster terminated Rains for the legitimate and non-discriminatory reason that it is untenable for an institution of higher learning to employ her to teach accounting and business ethics to students. The contrary would disserve Westminster's students. Her religion and sex were irrelevant—her adjudicated ethical misconduct was. Beyond this, Rains' ancillary claims do not withstand scrutiny. Consequently, there are no legal or factual bases to support liability against Westminster and Koerner.

<u>**UNDISPUTED MATERIAL FACTS**</u>

***Parties and general background***

1. Westminster is a liberal arts college located in Salt Lake City, Utah. Westminster hired Plaintiff, Emily Sharp Rains as an adjunct professor in 2013, and then as a full-time faculty member in 2014. *See* Exhibit A at ¶1.a. Melissa Koerner was a faculty member from 2004 to 2018, served as the associate dean of the Gore School of Business in 2014-15, then as interim dean from July 2015 until July 2017, and dean from July 2017 until June 2018. *Id.*

2. Westminster hired Rains in April 2014 as a full-time assistant professor of accounting, although she had no prior full-time teaching experience in academic settings. *Id.* at ¶3. Koerner directly supervised Rains for three years from August 2015 to June 2018. *Id.*

3. Rains' responsibilities included teaching business law, accounting, tax, and ethics. *Id.* at ¶9.b. Her responsibilities also included research, scholarship, and publication. Indeed, Rains was hired in large part because she said she planned to publish, which would enable her to obtain the

status of a "Scholarly Academic" faculty member for purposes of the Gore School's efforts to obtain AACSB accreditation. *Id.* at ¶20.a. Indeed, Rains received extensive release time from teaching responsibilities to engage in scholarship. *Id.*

4.   Westminster terminated Rains on October 18, 2018 after it learned that a Washington state court had found her liable for breach of the Washington Consumer Protection Act. *See* Exhibit B at 91: 2-11. Westminster College President, Bethami Dobkin, determined that Rains' conduct damaged Westminster's reputation and was inconsistent with her responsibilities to teach business ethics to Westminster students. *Id.* As detailed below, Rains' termination came at the end of a tumultuous tenure at Westminster.

***The Washington Litigation, its discovery, and Westminster's background check***

5.   Former clients of Rains sued her for breach of fiduciary duty and violation of the Washington Consumer Protection Act in December, 2012. *See* Exhibit C, at pp. 42-46. The litigation was pending in 2013 when Westminster hired Rains. *Id.* A jury trial occurred in late summer of 2014 resulting in a decision that she had breached her fiduciary duties to her former clients. *Id.* A decision of the Washington Court of Appeals remanded for a second trial the question of whether she violated the Washington Consumer Protection Act, and a trial occurred in the summer of 2018. *Id.* The jury determined that Rains breached the Washington Consumer Protection Act. A subsequent appeal terminated in 2020, with all counts affirmed against Rains. *Id.* See also *Rhodes v. Rains*, 195 Wn. App. 235 (Wash App. 2016); *Rhodes v. Rains*, 2020 Wash. App. LEXIS 1727 (Wash App. 2020); *Rhodes v. Rains*, 2020 Wash. App. LEXIS 2085 (Wash. App. 2020) (all cases attached hereto as Exhibit D).

6.   Rains did not disclose the pendency of the Washington Litigation at the time of her hiring. *See* Exhibit C at 50: 1-13. See also Exhibit A at ¶8. Indeed, the summer 2014 trial

overlapped with her teaching schedule, and she failed either to advise Westminster that the trial pertained to a case filed against her, or to arrange for coverage for her teaching duties. *Id.*

7.   Further, Rains never disclosed the verdicts reached in the Washington litigation. *Id.*

8.   The only person associated with Westminster that Rains told about the Washington litigation was her assistant, Jovana Sisovic. *See* Exhibit C, at p. 52.

9.   Rains claims that Westminster received copies of garnishments associated with the Washington Litigation, but admits she never told anyone why the garnishments were entered. *Id.* at 51-52. Notwithstanding, Westminster considered garnishments to be private matters and the college's HR department did not share such information with academic officers, such as Koerner. *See* Exhibit ¶8.b. Indeed, Koerner (Rains' direct supervisor) never knew about the garnishments until the present litigation. *Id.*

10. Rains, moreover, never disclosed the Washington Litigation to Koerner. *Id.*

11. Nevertheless, Westminster conducted a background check of Rains prior to her employment. The background check, however, was performed only on criminal matters and did not inquire into civil lawsuits. *Id.* at ¶8.b. See also Exhibit E, Response to Interrogatory 6 at p. 6.

12. The existence of the Washington Litigation was unknown until May 3, 2018. *Id.* at p. 7.

***Westminster's Faculty Contract Review and Faculty Retention Process***

13. As an overview, Westminster does not provide life tenure for faculty members. Instead, it offers ranked faculty members a series of fixed-term renewable contracts with faculty-led contract reviews at appropriate junctions. *See* Exhibit F, at Aff. Exhibit 2, pp. 5-9. New faculty members receive a two-year appointment, at the end of which, they can be awarded either a three-year contract, a one-year probationary contract, or no continuing contract. *Id.* The Faculty Manual provides clear guidance and expectations on the standards against which the faculty

member is to be judged and who is responsible for making the decision on the faculty member's advancement. *Id.* Following a three-year contract, a faculty member is eligible to receive a five-year contract. Thereafter, a series of renewable five-year contracts are available. *Id.*

14. However, at any period of contract review, a faculty member may be placed on a one-year probationary period, the purpose of which is to redress deficiencies in the faculty member's performance, prior to non-renewal of the faculty member's appointment. *Id.* The criteria against which a faculty member's performance is to be evaluated include teaching effectiveness, intellectual commitment, service to the college community, and professional and ethical conduct. *Id.* at p. 9. See also, Exhibit G, at §§ 3.4.1 and 3.4.2.

15. The process by which faculty contract reviews are conducted is also set forth in the manual. A faculty review committee of three faculty members (one chosen by the faculty member under review, one chosen by the faculty member's dean, and the faculty member's program chair), meets and evaluates the faculty member under review, according to the standards described above. *Id.* at §3.6.4. The review process includes classroom observation and review of a portfolio created by the faculty member, which includes teaching, research and service accomplishments. The committee then votes on their recommendation (e.g., whether to award a continuing contract, a probationary contract, or no continuing contract) and prepares a report of their decision. *Id.* at §3.6.7. The faculty member may then respond. *Id.* at §3.6.8. At this point, the faculty member's dean then prepares a report for Westminster's provost and president, which includes the committee's report and recommendation, as well as his or her report and recommendation. *Id.* at §3.6.9. At this point, the provost reviews these reports and makes a recommendation to the president, who makes the final decision on whether to award a continuing

contract or a probationary contract. *Id.* at §3.6.10. The president's discretion is bounded by the same considerations as stated above. *Id.*

16. If dissatisfied, the faculty member may appeal the president's final decision on contractual appointments to the Faculty Affairs Committee, a standing faculty committee. *Id.* at §3.8.2.1.

17. Faculty members may also initiate, at any time, a grievance procedure if they feel they have been harassed, discriminated against, or had their contractual or academic freedom rights violated. *Id.* at §3.9.

### *The 2015 Contract Review*

18. Plaintiff's first scheduled review occurred in fall 2015, in line with Westminster's regular practice for new full-time faculty members. Exhibit A at ¶27a-b. In line with standard practice, the faculty review committee attended Plaintiff's courses, evaluated her academic portfolio, and reached a recommendation based upon the standards set in the Faculty Manual. *Id.*

19. Prior to the review, however, the committee had to be assembled. Plaintiff chose Professor Steve Hurlbut as her choice. Defendant Koerner (as the dean) chose Professor Alysse Morton. As per the faculty manual, the third member of the committee was required to be Plaintiff's program chair. *Id.* at §27.d. Because Plaintiff reported to three program chairs, Koerner had to choose between Prof. Dara Hoffa (Accounting program chair), Prof. Rick Henage (Master of Accountancy (MAcc) program chair) and Prof. Brian Jorgensen (Management program chair). *Id.* Koerner selected Prof. Heneage because Plaintiff would teach many courses in the MAcc program and was essential to its success, and because Prof. Hoffa was very new to her position and experiencing difficulty meeting the requirements of her position. *Id.*

20. Koerner notified Plaintiff of the panel composition, but Plaintiff failed to object in writing within 72 hours as required by the faculty manual. *Id.* See also Exhibit G at §3.6.4.1.

21. The faculty committee thoroughly reviewed Plaintiff's teaching and portfolio. The committee was pleased with Plaintiff's service contributions to the college, but dissatisfied with her teaching effectiveness and lack of progress in research and publishing. *See* Exhibit A at §27.g. The committee outlined several suggestions for improvement in her performance and recommended by a 2-1 vote that she be awarded a one-year probationary contract. *Id.*

22. Koerner carefully evaluated the committee report and Plaintiff's performance in a report to the president and provost. Notably, although Plaintiff had some teaching strengths, six student complaints had reached the dean's office—more than any other professor at the business school. *Id.* at §27.h. Koerner's review of student course evaluations also revealed that Plaintiff's ratings were below or significantly below the school's average on all but two items on the evaluation. *Id.* Overall, Plaintiff's ratings were among the lowest in the business school, and centered around inadequate feedback, untimely grading, and lack of preparation and organization. *Id.*

23. Koerner also noted that Plaintiff had essentially failed to follow through on her commitment to academic research and publication, which was vital for the business school to obtain AACSB accreditation. *Id.* at §27.i. Koerner also reported that Rains spent more time than appropriate on college service and placed insufficient emphasis on teaching and scholarship. *Id.*

24. Subsequently, Koerner recommended to the provost and president that a one-year probationary contract be awarded. *Id.* at §27.k. This recommendation was adopted by the provost and president, specifically noting that a probationary contract was appropriate due to Plaintiff's persistent failures to competently organize, plan, and execute teaching responsibilities. *Id.*

Koerner and the provost met with Plaintiff to discuss the president's decision and to identify a plan for improving her performance. *Id.*

25. Thereafter, Plaintiff appealed to the Faculty Affairs Committee, arguing that the membership of the faculty review committee was wrong, and that Prof. Hoffa should have served rather than Prof. Henage. *Id.* at §27.m. Notably, Rains had never raised this issue. Nevertheless, after review, the Faculty Affairs Committee agreed with Plaintiff, and recommended that a second review take place with Prof. Hoffa serving instead of Prof. Henage. *Id.*

**The 2016 Contract Review**

26. Thereafter, the newly constituted review committee completed its report in April 2016. *Id.* at§ 28.b. Its report detailed essentially no major differences from the 2015 report with respect to Plaintiff's teaching, research, and service. Nevertheless, the 2016 committee voted 2-1 to recommend that Plaintiff receive a three-year contract. *Id.*

27. Because the faculty manual required the deans to write their own recommendation after review of the committee report, Koerner independently reviewed and evaluated the question of whether to recommend a probationary or three-year contract. *Id.* at §28.c. Because the committee report did not present any new information about Rains' performance, and Koerner did not observe any significant changes in Plaintiff's performance, Koerner continued her recommendation of a one-year probationary contract. *Id.* at 28.d-f. This was adopted by the provost and president, and a one-year probationary contract was awarded. *Id.* Notably, Plaintiff did not appeal this determination. *Id.* See also, Exhibit C, at pp. 175-76.

***The 2017 Contract Review***

28. Rains underwent a contract review in the spring of 2017, at the end of her probationary year. *See* Exhibit A at ¶29. The review committee recommended awarding a three-year contract upon a 3-0 vote. *Id.* Koerner agreed with this recommendation, but with reservations. *Id.*

29. Koerner noted that Plaintiff's teaching performance had improved across all items on her course evaluations, although she remained below average on some items. *Id.* at ¶29.d. Further, only one student complaint had been received at the dean's office, in contrast to six for the previous period. *Id.*

30. Koerner also noted that Plaintiff had not published any articles in academic journals and had not made meaningful progress on her scholarship. *Id.* at ¶29.e and ¶29.c. Although Rains was noted to be involved in several projects and initiatives, Koerner remained concerned that Rains was not placing enough emphasis on her teaching effectiveness and scholarship. *Id.* Nevertheless, because her teaching had improved, Koerner recommended Rains receive a three-year contract, in which the president and provost agreed. *Id.*

***Rains' Turbulent Tenure***

31. During her tenure at Westminster, Rains exhibited several performance problems and was, generally, a disruptive presence. Koerner regularly received complaints about Rains' behavior from across the college community. *Id.* at ¶30. Common themes of complaints from fellow faculty, staff, and students were that 1) Rains was combative, uncooperative, and disrespectful to staff groups and faculty committees; 2) she failed to provide advance notice to staff when she required their assistance, forcing them to forego other work at her insistence; and 3) she regularly failed to complete faculty administrative tasks on time, creating extra work for others. *Id.* at ¶30.

32. Some of these complaints include:

- Failing to provide enough advance notice to Information Services managers Colin Bunker and Winter Morse of needs for the VITA clinic in 2015 and 2016, forcing them to rush to complete IT tasks prior to the launch of each tax clinic;

- Failing to follow the Marketing and Communications Department's guidelines when requesting projects and failing to cooperate with that department's head, Sheila Yorkin, in January 2017;

- Submitting personnel action forms for Jovana Sisovic to the HR director in 2017-18 without the dean's approval, despite repeated reminders that this was required;

- Failing to appropriately approve the time record and track the work hours of Jovana Sisovic, who was working directly under her supervision, and exposing the college to liability for unpaid wages for Sisovic;

- Failing to follow grant proposal guidelines as set forth by the Provost's office;

- Misrepresenting conversations she had with Annalisa Holcomb, Vice President of Institutional Advancement in May 2018 regarding fund-raising campaigns;

- Failure to work effectively with Rick Henage, MAcc program chair, on course design and curricula in 2015-2017;

- Often neglecting to submit course syllabi, book orders, and end-of-semester grades on time through 2016-2018;

- Cancelling class sessions with little advance notice;

- Failure to work cooperatively with the Undergraduate Core Curriculum Redesign Committee in 2015-2017;

- And, as mentioned above, numerous student complaints regarding classroom instruction. *Id.* at ¶30.

33. Additionally, Plaintiff manifested hostility toward Koerner throughout her tenure, regularly making unannounced visits to Koerner's office, and on several occasions, loudly and angrily berating Koerner over differences of academic matters such as student complaints. *Id.* at ¶31. Often, these outbursts were precipitated by Koerner—Rains' direct supervisor—requesting updates on the status of Rains' projects, publications, or commitments. *Id.*

34. During her tenure, Rains was responsible for managing the VITA program (Voluntary Income Tax Assistance), which was a tax-intensive student practicum. Although she successfully expanded its scope and received community recognition for the program's breadth, she mismanaged the program in several ways:

- she expanded the program well beyond its original educational objective, greatly increasing its cost, complexity, and faculty time commitment. Some of these expansions came at a time when funds were unavailable to support these efforts;

- she failed to monitor the program's finances closely, often approving expenditures when funding was unavailable;

- between 2017 and 2018 she was unable to secure consistent donor funding, and the VITA program operated in deficit for nearly an entire year. She also submitted proposals to potential donors that contained operational commitments that had not been approved by Koerner or the college;

- she failed to manage her assistant, Jovana Sisovic, in an effective and rational manner. *Id.* at ¶34-38.

35. Notably, in January 2017 Rains had a serious disagreement with a major donor, CAP
Utah, resulting in her discontinuing their relationship. This led to a loss of $8,000 in funding and
eventually resulted in the program running a deficit throughout the next year. *Id.* at ¶36. Notably,
Rains provided misleading explanations to Koerner regarding the extent of the CAP Utah
funding commitment and its intended use. *Id.*

36. During this period, Rains supervised Jovana Sisovic as the VITA clinic coordinator. She
mismanaged Sisovic' s employment in several ways: 1) she repeatedly tried to change Sisovic's
employment status from temporary part-time to full time without approval from Koerner; 2) she
allowed and directed Sisovic to work over 300 hours despite the fact that there were insufficient
funds in the VITA program to pay Sisovic; and 3) she failed to inform or advise Sisovic that as a
temporary, part-time employee, she was required to keep her work hours within a specified
range. *Id.* at ¶39.

37. Additionally, in 2016 and 2017 Rains launched the LITC (Low Income Tax Compliance)
Practicum, with IRS grant funding. *Id.* at ¶40. For her leadership of this program, she was given
3 credit-hours release time to prepare the program and 4-credit hours to manage it. However,
shortly before the spring 2017 semester began, the number of students enrolled in the LITC
course was below the level required for elective courses to be held. Shortly thereafter, Koerner
noticed that six new students suddenly enrolled. She then learned that Rains had promised the
students they could substitute the highly specialized LITC course for a core strategy course that
was required for graduation. Rains claimed she arranged the substitution so that students could
fit the LITC course into their schedule, but was clear that the inappropriate substitution was
made to increase course enrollment and avoid cancelling the course. *Id.* Unfortunately, the
course was unsuccessful, and the course evaluations revealed that Rains provided almost no

direction to the students, provided very little structure regarding the course, and was unresponsive to student requests. *Id.*

38. Additionally, during her tenure, Rains submitted several funding proposals to donors without first reviewing them with her dean. She submitted several grant applications for dean review without adequate advance notice, and she submitted at least one grant application to a donor without any dean or provost review at all. *Id.* at ¶44.

### Discovery of the Washington Litigation and Rains' termination

39. As noted above, Koerner discovered the pendency of the Washington litigation in May of 2018. *Id.* at ¶7. Because Koerner was planning to retire from Westminster, she spent April and May of 2018 preparing packets of background material on the Gore School's 33 faculty members for the incoming dean, Dr. Orn Bodvarsson. When reviewing Rains' most recent self-evaluation, Koerner noted that Rains stated she was preparing to argue a case in front of the Washington State Supreme Court, which seemed to be an impressive accomplishment to Koerner. It was at this point that she conducted a google search using the terms "Emily Sharp Rains Washington Courts" and discovered several court documents relating to the Washington litigation. *Id.*

40. Koerner was concerned that a finding of breach of fiduciary duty had been made against Rains in a Washington court, particularly because the allegations and findings were directly related to the subjects Rains was assigned to teach, including business law, accounting, tax, and ethics. *Id.* at ¶9. Koerner was particularly concerned that students, faculty, colleagues, and donors would question Westminster's reputation and ethics by continuing to employ such a professor. *Id.* Further, the conduct described of Rains in the various court documents mirrored behavior Koerner had personally witnessed from Rains. *Id.* This included negligent management of company books and ledgers. *Id.*

41. On May 9, 2018 Koerner and Interim Provost Richard Badenhausen met with Rains to discuss the Washington litigation. Koerner advised Rains that Koerner would have to investigate the accounts and programs that Rains managed. *Id.* at ¶10. During this meeting, Rains complained that Koerner was "biased against her", but never complained of discrimination on the basis of gender or religion. *Id.*

42. Thereafter, Koerner investigated the programs and accounts that Rains had been managing, including the VITA program, LITC program, and Tax Institute. She submitted a report of her findings to Badenhausen prior to her June 2018 retirement. During this period, Koerner discovered that:

- Rains failed to disclose the pendency of the Washington litigation;

- Rains allowed and directed Jovana Sisovic to work over 300 hours without pay, knowing that there was a negative balance in the VITA program's accounts;

- During this period, Rains claimed that Sisovic had merely "volunteered" to work those hours, but this raised concerns for Koerner that Westminster may be in violation of labor laws because Rains' essentially asked an employee to "volunteer" to complete her regularly assigned work duties;

- After retention of outside counsel, Koerner determined that Westminster could face liability under the Fair Labor Standards Act if it failed to pay Sisovic;

- Even if not a violation of law, Rains nevertheless violated Koerner's explicit directives not to allow Sisovic to work when there was no funding to pay her;

- Notably, Rains had misrepresented the donor's approval of funding for Sisovic's H1-B visa application, incorrectly stating that CAP Utah had specifically authorized more

than $5,000 in donor funds to be used to pay for legal expenses associated with Sisovic's visa, when they had not;

- Rains had used donor funds in a manner not authorized by donors. *Id.* at ¶11.

43. Ultimately, Westminster terminated Rains on October 18, 2018. Exhibit B at 91: 2-11. The basis for her termination was that in August 2018, a jury concluded that she had violated the Washington Consumer Protection Act. *Id*.

***Rains' treatment compared to her peers***

44. Notwithstanding her turbulent history at Westminster, Rains was treated very well when compared with her peers. For example:

- Rains' base salary was higher than all of the junior faculty members she identified as similar peers. Indeed, her salary was higher than the professor she replaced and any who replaced her. *See* Exhibit A at ¶14. Although three accounting professors were paid more than Rains, they had 42 years, 30 years, and 26 years of academic experience, in comparison to Rains who was a brand-new faculty member. *Id.*

- Rains' academic workload was similar to those of her peers. In fact, four of her peers had higher workloads than her. Additionally, she received a total of 10.5 hours of release time to prepare and publish scholarly articles, although she failed to ever publish in any academic journals. *Id.* at ¶15.

- Rains received comparable administrative release time to that of her peers. *Id.* at ¶16.

- Rains was given more office space than her peers during her tenure. *Id.* at ¶17.

- Rains received a comparable amount of support from the Westminster's institutional fundraisers. *Id.* at ¶18.

- Rains received the same training opportunities as other faculty members. *Id.* at ¶19.

45. In contrast, Rains' academic performance was poor. She never published any articles or scholarly papers in academic journals. *Id.* at ¶21. She was a frequent subject of student teaching complaints. *Id.* at ¶22. And, her student course evaluations were consistently below average. *Id.* at ¶23.

### The Chronicle of Higher Education Article

46. Interim Provost Richard Badenhausen wrote an article concerning his experience as an interim provost, which was published in the Chronicle of Higher Education. *See* Exhibit L. He wrote it under his own name and expressing his own views. *Id.* Westminster did not authorize or sanction the article. *Id.* See also Exhibit K at pp. 112-114.

47. In this article, Prof. Badenhausen made reference to a faculty member who had to be terminated after being found "guilty" of "fraud". Nevertheless, Prof. Badenhausen was not speaking on behalf of Westminster when he wrote the article, and was only expressing his individual views. *Id.*

### Westminster's Supervision of Rains was Reasonable and Consistent with National Standards

48. Provost David Douglass, of the College of Idaho, has reviewed this case and evaluated all of Rains' claims. *See* Exhibit F. He has completed an expert report, which he attests to in his affidavit. *Id.*

49. Upon completion of his review, Provost Douglass, who has unique experience managing academic affairs and supervising academic employees at peer institutions to Westminster, opines that its management and termination of Rains was appropriate in all respects. *Id.* Further, Westminster's conduct was consistent with customary practices at similar institutions across the nation. *Id.*

***Rains never complained of gender or religious based discrimination until August 2018, then specifically directed Westminster not to pursue investigation***

50. Although Rains asserts that Westminster ignored her complaints of harassment and discrimination against Koerner, the evidence demonstrates that Rains refused to cooperate with Westminster when it learned that she may wish to pursue such a complaint. The first time Rains ever made any mention of Koerner harassing her was in May, 2018. *See* Exhibit C at 300-305.

51. However, this was the May 9, 2018 meeting at which Koerner and Badenhausen confronted Plaintiff about the newly discovered Washington Litigation. *See* Exhibit A at ¶6. See also Exhibit H, response to Interrogatory 15 at p. 40. Further, Rains did not complain of discrimination on the basis of either gender or sex, but instead complained of "harassment". Exhibit A at ¶6.

52. Thereafter, Plaintiff stated to Westminster in a meeting on August 22, 2018 that she had been the subject of "discrimination." *See* Exhibit C at p. 304. Two days later, Julie Freestone of Westminster emailed Rains and invited her to submit information relating to her claim of harassment or discrimination. *See* Exhibit I. Rains, however, refused to cooperate. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322-34, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). For purposes of summary judgment, "the nonmoving party is entitled to all reasonable inferences from the record." *Water Pik, inc. v. Med-Sys, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). However, "if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id.* at

1143-44. Appellate courts review the district court's ruling on summary judgment de novo, applying the same standard as the district court. *Universal Underwriters Ins. Co. v. Winton*, 818 F.3d 1103, 1105 (10th Cir. 2016).

## ARGUMENT

### I. Defendants are entitled to summary judgment on Plaintiff's breach of contract claims. The undisputed material facts make clear that Westminster did not breach any contract with her. Plaintiff's termination followed all applicable contracts

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Espenschied Transp. Corp. v. Fleetwood Servs.,* 2018 UT 32, ¶15. A party breaches the contract if he or she fails to do what was promised in the contract. Utah MUJI 2d CV 2115. See also Restatement (Second) of Contracts, §235 (1981). To show a breach of the implied covenant of good faith and fair dealing a plaintiff must show that the defendant intentionally or purposely took an act which injured the other party's right to receive the fruits of the contract. *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991). However, the implied covenant comes with a "high bar" for its invocation. The covenant does not create obligations inconsistent with express contractual terms. *Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶10. Consequently, compliance with the terms of a contract necessarily extinguishes any claims for breach of the implied covenant.

Rains asserts that Westminster breached its employment contract with her in the following respects: 1) not issuing her supplemental contracts; 2) failing to investigate her complaints of harassment against Koerner; 3) terminating her because she complained about discrimination; 4) terminating her employment in violation of the faculty manual, and 5) publishing information regarding her termination in the Chronicle of Higher Education. *See*

19

Complaint at ¶85. For the reasons detailed herein, summary judgment should be granted against her as to breach of contract and breach of the implied covenant of good faith and fair dealing.

### A. Westminster terminated Rains in compliance with the Faculty Manual

Looking first at her complaint for breach of contract relevant to her termination, the undisputed facts demonstrate that a jury found Rains liable for violating the Washington Consumer Protection Act and breach of fiduciary duty. President Dobkin testified in her deposition that **1)** she makes the final decision to terminate a faculty member (Exhibit B at 65: 17-25); **2)** she bases her decision generally on the Faculty Manual (*Id.* at 66: 2-6); **3)** she decided to terminate Rains because she was found liable by a jury for breach of fiduciary duty (*Id.* at 91: 2-11); **4)** Plaintiff had responsibilities for teaching business ethics (*Id.*); **5)** Plaintiff's conduct and adverse jury verdict risked the college's reputation (*Id.*); and **6)** her decision to terminate Plaintiff culminated when she was found by a jury to have violated a law. *Id.* at 93: 14-25.

The Faculty Manual provides, in pertinent part that Westminster "may dismiss a faculty member at any time when the president, after consultation with the chief academic officer and the dean, believes, in good faith that…the faculty member violates a federal, state, or city statute, and such violation places at risk the College's reputation; affects the credibility or effectiveness of the faculty member as an educator…" *See* Exhibit G at 3-31.

The terms of the faculty manual are unambiguous and provide that termination is appropriate when Westminster's president believes in good faith that the faculty member violated a statute which jeopardized the college's reputation. It is undisputed that a jury determined that Rains violated the Washington Consumer Protection Act. Under Washington law, a person cannot be liable for violation of the consumer protection act unless the plaintiff shows that the defendant engaged in an unfair or deceptive practice. *Hangman Ridge Training*

20

*Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn. 2d. 778, 784-85, 719 P.2d 531 (1986). President

Dobkin believed in good faith that such a violation would risk Westminster's reputation and

affect Plaintiff's credibility as an educator. There is no evidence to the contrary. Consequently,

Plaintiff's termination complied with the Faculty Manual. Summary judgment is appropriate.

**B. Westminster did not breach any contract in its handling of Plaintiff's harassment complaints**

Plaintiff cannot prevail on her claim that Westminster breached the contract by failing to

investigate her complaints of harassment against Koerner. This is for three reasons: 1) Plaintiff

never submitted that complaint to the mandatory grievance procedure; 2) Plaintiff waived her

right to pursue this claim; and 3) Koerner never harassed her. Given these facts, there is no

evidentiary basis to support a finding that Westminster breached the contract, and summary

judgment is appropriate.

As noted above, Plaintiff confirmed in her deposition that her first complaint of

harassment was on May 9, 2018. *See* Exhibit C at 303: 16-25; 1-10. See also Exhibit H, response

to Interrogatory 15 at p. 40. There is no evidence, however, that she ever requested that a

grievance procedure be initiated. Under section 3.9 of the Faculty Manual, Plaintiff had the right

to initiate a grievance against Koerner on this basis. *See* Exhibit G at p. 3-37 through 3-39. The

grievance procedure vests a complaining faculty member with the right to initiate a grievance by

presenting "their grievance, including any documentary support, in writing to the chief academic

officer." *Id.* In fact, on August 24, 2018, Westminster invited Plaintiff to initiate this process if

she chose. *See* Exhibit I and Exhibit C, at pp. 304-304.

Plaintiff, however, never submitted a grievance. Indeed, she specifically decided not to.

*Id.* Notably, the Faculty Manual determines that the grievance procedure is mandatory and "will

be final." *See* Exhibit G at p. 3-37 through 3-39. She cannot claim that Westminster breached its

contract with her by failing to investigate her allegations of harassment when she failed to avail

herself of the contractual remedy for that harassment. Westminster cannot be liable for breach of

contract for failing to do something it never promised to do. Utah MUJI 2d CV 2115. See also

Restatement (Second) of Contracts, section 235 (1981). It promised to allow Rains a grievance

procedure, but she ignored it. Summary judgment is appropriate.

### C. Westminster did not terminate Rains for complaining about discrimination and she was not harassed

Rains claims in her complaint, without factual basis, that she was terminated for

complaining about discrimination. However, as noted above, Westminster terminated her after it

discovered a Washington jury found her liable for breach of fiduciary duty. There is no evidence

to the contrary, and the Court should grant summary judgment in Westminster's favor.

Relatedly, Rains complains that Koerner "harassed" her. The undisputed facts show, however,

that Koerner supervised Rains in an appropriate manner. None of Rains' various complaints

against Koerner transcend typical workplace supervision of employees by supervisors.

### D. Westminster followed the faculty manual in connection with Rains' 2015 faculty review, and she waived her claims arising out of that review by failing to appeal any adverse decision against her

Rains claims that Westminster breached the faculty manual in failing to issue her

"supplemental contracts." This refers to an episode in which a scheduled 2015 faculty review

resulted in her being awarded a one-year probationary contract rather than a three-year contract,

which she apparently expected. As noted above, the initial 2015 faculty review resulted in a 2-1

determination that Rains only be awarded a one-year probationary contract on the basis of

deficiencies in her teaching effectiveness. Exhibit A at ¶27. Koerner, Provost Lisa Gentile, and

President Morgan endorsed and adopted this recommendation. *Id.* Plaintiff, however, appealed

the decision to the Faculty Affairs Committee, pursuant to the Faculty Manual. *Id.* She argued

that the composition of the committee was incorrect and that it should not have relied on teaching surveys. *Id.* The Faculty Affairs Committee agreed with Plaintiff that the committee composition was incorrect, but disagreed that the original peer review committee improperly used teaching surveys. *Id.* A new review with an altered committee occurred in 2016, resulting in a 2-1 recommendation that Plaintiff receive a supplemental three-year contract. *Id.* at ¶ 28. However, Dean Koerner recommended in favor of a one-year probationary contract, in which Provost Gentile and President Morgan concurred. Plaintiff was dissatisfied with this, but never appealed that decision. *Id.* See also Exhibit C, at pp. 175-176.

Under the Faculty Manual, the decision to award faculty contracts, and the lengths of those contracts, is under the discretion of Westminster's president. Exhibit G at 3.6.10(b). The president's decision must consider the report of the review committee, but also the opinions of the dean and the provost. *Id.* The college was then required to provide a written statement to Plaintiff explaining its rationale. To prove breach of contract, Plaintiff must show that this did not happen. However, as shown in Dean Koerner's affidavit, Westminster followed this requirement. See also Exhibit J. Indeed, the president's final recommendation on this matter demonstrated that Westminster primarily assessed Plaintiff's teaching effectiveness, consistent with the faculty manual. *Id.* This was entirely consistent with the requirements of the faculty manual, and thus do not constitute breach of contract. Summary judgment is warranted.

Plaintiff, moreover, waived her right to claim breach of contract on this issue. The faculty manual directly provides that faculty members dissatisfied with the president's decision may appeal to the Faculty Affairs Committee. *See* Exhibit G at §3.6.10(e), 3-22. Plaintiff never appealed this decision. Exhibit A at ¶28.f. See also Exhibit C, at pp. 175-76. Interestingly,

Plaintiff chose not to appeal to the Faculty Affairs Committee, despite having earlier prevailed in an appeal to that committee concerning the composition of her peer review committee.

Plaintiff's failure to appeal thus constitutes waiver. "A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be (1) an existing right, benefit or advantage, (2) a knowledge of its existence, and (3) an intention to relinquish it." *McCleve Props., LLC v. D. Ray Hult Family Ltd.*, 2013 UT App 185, ¶10 (internal quotations and citations omitted). In the contract context, a waiver "occurs when a party to a contract intentionally acts in a manner inconsistent with its contractual rights, and, as a result prejudice accrues to the opposing party or parties to the contract." *Mid—America Pipeline Co. v. Four—four, Inc.*, 2009 UT 43, ¶17. Here, there is no doubt that Plaintiff (1) had the right to appeal the President's 2016 decision and (2) knew of that right. She had successfully availed herself of that right and remedy. By not appealing, she acted intentionally to relinquish that right of appeal. This prejudiced Westminster because it could have worked with Plaintiff to resolve her dispute in 2016 in the academic context rather than in much costlier litigation. Plaintiff further manifested intent to waive her right to appeal Westminster's 2016 decision by continuing her employment without further protest. Summary judgment is warranted on Plaintiff's breach of contract claims.

### E. Westminster did not publish the Chronicle of Higher Education Article

Plaintiff contends that Westminster breached its contract with her by publishing the facts of her termination in the Chronicle of Higher Education. First, there is no showing that Westminster had a contractual duty not to publish. But more than this, there is no dispute of fact that Westminster was not the publisher of the allegedly defamatory statement in the Chronicle of Higher Education. Richard Badenhausen wrote the article. See Exhibit E Westminster's Response to Plaintiff's 17th Interrogatory. See also Exhibit K at pp. 112-114. Moreover, the

speech in question reflected his own views and he was not speaking on behalf of Westminster.

See Exhibit L. Consequently, the Court should grant summary judgment against Plaintiff.

## II. The undisputed facts demonstrate that Koerner did not impermissibly interfere with Plaintiff's prospective economic relations. There is no evidence that Koerner acted by improper means. To the contrary, her supervision of Rains was appropriate and reasonable.

Plaintiff claims that Koerner intentionally interfered with her economic relations. The basis for this claim appears to be Koerner's recommendations in 2015 and 2016 that Rains not be advanced to a three-year contract, and her commencement of an investigation in 2018 regarding Plaintiff's conduct at Westminster. The Court should grant summary judgment in Koerner's favor, because there is no evidence that she acted by improper means.

"In order to win a tortious interference claim under Utah law, a plaintiff must now prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2), by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 2015 UT 21, ¶71 (cleaned up). For purposes of this tort, a defendant uses "improper means" when he or she engages in "conduct contrary to law—such as violations of statutes, regulations, or recognized common-law rules—or the violation of an established standard of a trade or profession." *C.R. Eng. v. Swift Transp. Co.*, 2019 UT 8, ¶48. See also *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991) ("Improper means are present where the means used to interfere with the party's economic relations are contrary to law, such as violations of statutes, regulations or recognized common-law rules."). However, "a deliberate breach of contract, even where employed to secure economic advantage, is not, by itself, an 'improper means.' Because the law remedies breaches of contract with damages calculated to give the aggrieved party the benefit of the bargain, there is no need for an additional remedy in

tort…)" *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 309 (Utah 1982) (overruled on

other grounds in *Eldridge v. Johndrow*, 2015 UT 21, ¶71).

Rains cannot succeed on her intentional interference claims against Koerner because she

cannot show improper means. Rains contends that Koerner harassed and discriminated against

her when she "arbitrarily [curtailed] her academic freedom," "[denied] her supplemental

contracts, [placed] her on probation, then [launched] a sham investigation on the false pretext of

the Washington Litigation and culminating in the wrongful termination of [Plaintiff's]

employment…]" *See* Exhibit H, at p. 18.  Yet most, if not all, of these alleged actions do not rise

to the level of violating "statutes, regulations, or recognized common-law rules." *Leigh* at 309.

And even if Plaintiff could somehow succeed (or at least proceed to trial) on a breach of contract

theory against Westminster, Koerner's role—even if intentional—in causing a breach of contract

cannot form the basis of an intentional interference claim under Utah law. *Id*.

Consequently, any allegations that Koerner played a nefarious role in Plaintiffs' 2015 and

2016 contract reviews, or her ultimate termination, cannot serve as the basis of a tortious

interference claim. Causing Westminster to breach a contract simply will not support a claim for

tortious interference. This leaves only Plaintiffs' vague and general allegations that Koerner

"harassed" her through her "curtailing of her academic freedom" and opening an investigation

against her.

These cannot, however, succeed as a matter of law. First, as noted by Prof. Douglass the

"dispute" over whether Rains was denied academic freedom largely came down to the question

of whether she was appropriately balancing law and business in a business law course that she

taught, with Koerner encouraging a different balance and advocating for a different mix of these

subjects in the curriculum. Such questions, however, are routine, non-controversial, and do not

implicate academic freedom as that term is understood. *See* Exhibit F. Second, as Plaintiffs'

direct academic supervisor, Koerner had a legal duty to supervise the development of business

school curriculum. Third, as dean of the business school, Koerner also had a legal duty to

investigate any occurrences which might implicate the integrity of the school or its faculty.

When Koerner learned of the Washington Litigation, it was her responsibility to determine

whether it implicated Westminster's reputation and the teaching mission of the Business School.

  Plaintiff's complaint against Koerner on this score is essentially that she supervised her in

ways she found to be objectionable. However, this does not arise to the level of intentional

interference. Even if the Court is inclined to believe that Koerner may have been mistaken in her

judgment, this does not constitute an improper means. "[A] defendant should not be liable for

interfering with a contract where the interference was caused by the defendant's doing of an act

which he had a legal right to do." *C.R. Eng. v. Swift Transp. Co.* at ¶ 41 (internal quotations and

citations omitted). Additionally, Koerner's supervision of Rains cohered with reasonable

practice. *See* Exhibit F. See also Exhibit A. Where Koerner had both a legal right and duty to

take the steps she took, she cannot be liable for intentional interference, and the Court should

grant summary judgment in her favor.

### III. *The Court should dismiss Rains' federal and state discrimination claims because there is no evidence of discriminatory conduct against Rains, and the jury verdicts against Rains constitute a non-pretextual legitimate business purpose for her termination*

  The heart of Plaintiff's claim is that Westminster discriminated against her on the basis of

sex and religion. Specifically, she claims that she received disparate treatment as a non-LDS

woman, ultimately resulting in her termination. The evidence overwhelmingly demonstrates,

however, that Westminster terminated her because a jury found her liable for breach of the

Washington Consumer Protection Act and her ongoing employment presented an unacceptable

risk of damage to Westminster's reputation. The Court should thus grant summary judgment in Westminster's favor because it had a legitimate and non-pretextual business reason for terminating her. As such, her claim of discrimination must fail.

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms of conditions, or privileges of employment because of such individual's race, color, region, sex, or national origin…" 42 U.S.C. 2000e-2(a)(1). A plaintiff can prove employment discrimination one of two ways (1) by presenting direct evidence of discrimination; or (2) by using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 668 (1973). See also *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213, 135 S. Ct. 1338, 191 L. Ed. 2d 279 (2015). Under *McDonnell Douglas*, a three-step analysis requires the plaintiff first to prove a prima facie case of discrimination. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002). To do so, a plaintiff must establish 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) she is qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class. *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant does so, the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that that the explanation is pretext. *Garrett* at 305 F.3d 1216.

The same framework applies to her state-law claim under UCA §34A-5-106. *University of Utah v. Indus. Comm'n*, 736 P.2d 630, 634-35 (Utah 1987) (applying the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed.

2d 668); *Darvish v. Labor Comm'n Appeals Bd.*, 2012 UT App 68, ¶23 ("The Utah

Antidiscrimination Act was modeled after Title VII of the Civil Rights Act of 1964" and the

substantial body of federal caselaw interpreting Title VII is useful); and *Li Zu v. Avalon Health

Care, Inc.*, 806 Fed. Appx. 610, 616 FN 2 (10th Cir. 2020) (noting that "the burden-shifting

framework and prima facie elements developed in Title VII cases also apply to discrimination

claims under the Utah Antidiscrimination Act).

     As an initial matter, there is no evidence that Plaintiff can meet her *prima facie* burden

under the *McDonnel Douglas* test. Although she might be a woman, and not a member of the

LDS religion, there is no evidence that she was treated less favorably than other persons at

Westminster not members of the relevant protected classes. *Khalik* at 1192. Indeed, as

documented in Statement of Fact 44, supra, the evidence indicates she was treated more

favorably than her peers. Further, because she engaged in behavior leading to a finding of

liability under the Washington Consumer Practices Act, she cannot prove that she is qualified for

the position of a professor of accounting at Westminster. All faculty members of Westminster

are expected to demonstrate high standards of ethical and professional conduct. Exhibit G at

3.4.1, 3.4.5, 3-12-3-13.

     Even assuming she could make a *prima facie* case, however, the Court should grant

summary judgment in Westminster's favor on her discrimination claims because she was

terminated for a legitimate, non-discriminatory business purpose. Simply stated, the Washington

Litigation resulted in a jury verdict assessing Rains liable for breach of the Washington

Consumer Practices Act. The Faculty Manual specifically provides that if a faculty member is

found responsible for breaching a statute which could risk damage to Westminster's reputation,

termination is appropriate. This constitutes a legitimate business reason.

Nor can Plaintiff prove that this was pretextual. To prove pretext, Plaintiff must show that the proffered non-discriminatory explanation is so "incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Johnson v. Weld County,* 594 F.3d 1202, 1211 (10th Cir. 2010). However, the employment decision need not be "wise, fair or correct." *Id.* Instead, the question is whether the employer honestly believed the reasons it gave for the employment decision and acted in good faith on those beliefs. *Id.* See also *Rivera v. City & County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004). Indeed,

> To support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong. He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda. This is because Title VII licenses us not to act as a "super personnel department" to undo bad employment decisions; instead, it charges us to serve as a vital means for redressing discriminatory ones.

> *Johnson* at 1211.

Plaintiff cannot show pretext. As stated in Plaintiff's deposition testimony, the jury verdict was not entered against her until August 2018. Exhibit C, at p. 45. She was terminated in October 2018, shortly after the judgment came to light. Consequently, the evidence is clear that as soon as Westminster reasonably knew of the jury verdict, it acted to terminate her. There is simply no evidence pointing to any inconsistency on this score.

Plaintiff may suggest that Westminster knew of the Washington Litigation throughout the entirety of her tenure at Westminster, citing a background check that was performed on her and the existence of various writs of garnishment issued to the Westminster incident from that litigation. Both arguments, however, are unavailing.

First, Westminster's background check did not inquire into civil actions, but instead focused on criminal convictions. See Exhibit E, at p. 6. See also Exhibit A at ¶8.b. Consequently,

Plaintiff would be incorrect to suggest that Westminster knew of the litigation through this

avenue. Second, Westminster did not learn of the Washington Litigation until May 2018 when

Koerner discovered the litigation through internet searches after reviewing Rains' portfolio. *See*

Exhibit A at ¶7. Third, although there were some writs of garnishment provided to Westminster,

these did not state the basis for the judgment. *Id.* at ¶8.b. Consequently, Westminster did not

know of the Washington litigation. Plaintiff may argue that Westminster "should have known",

but Westminster may "get it wrong" without falling foul of Title VII. See also *Johnson v. Weld

County* at 1211. Instead, Plaintiff must show evidence that Westminster does not really believe

that the Washington Litigation was the reason it terminated her. But such evidence does not

exist. Summary judgment is thus appropriate on the discrimination claims.

Plaintiff may also argue that she was the victim of unlawful discrimination as a result of

the 2015 contract review, which placed her on probation, rather than granting her a three-year

contract. However, as stated herein, Koerner's basis for recommending (and Westminster's basis

for ratifying that recommendation) a probationary contract was due to deficiencies in Plaintiff's

teaching performance. *See* Exhibit A at ¶27. By 2017 this had improved, and Koerner

recommended Plaintiff be advanced to a three-year contract. *Id.* at ¶30. If Koerner and

Westminster truly wished to discriminate against Rains for unlawful purposes, they would not

have extended her length of employment, and no reasonable factfinder could conclude that

granting a favorable employment action in 2017 was evidence of discrimination. Summary

judgment on the discrimination claims is thus warranted.

IV.     *There is no evidence that Westminster was negligent in its employment of Koerner*

Plaintiff claims that Westminster was negligent in its employment and supervision of

Koerner. The Court should grant summary judgment on this claim for two reasons. First, there is

31

no evidence that Westminster failed any duty of care owed to Plaintiff. Second, Plaintiff's claim is barred by the exclusive remedy of the Utah Worker's Compensation Act.

To prevail on a claim for negligent employment, Plaintiff must show that Westminster 1) knew that Koerner and its other employees posed a foreseeable risk of harm to her; 2) that these employees did, in fact, inflict such harm, and 3) that Westminster's negligence in hiring, supervising, or retaining the employees proximately caused the injury. *Retherford v. AT&T Comm's*, 844 P.2d 949, 973 (Utah 1992). Consequently, Plaintiff must show breach of a duty.

Plaintiff lacks any such evidence. As shown herein, there is no evidence that Defendants unlawfully harassed or discriminated against Plaintiff. To the contrary, Koerner provided conscientious and effective supervision of Plaintiff, and Westminster only dismissed Plaintiff upon learning of the Washington litigation. There is no evidence that Westminster knew, or should have known, that Koerner posed some risk of harm to Plaintiff, nor any evidence that it breached a duty of care to her. Consequently, summary judgment is appropriate. Indeed, the overwhelming weight of evidence is that Westminster acted appropriately in its supervision of Rains in all respects. *See* Exhibit F.

Second, Plaintiff's claim for negligent employment is barred by the exclusive remedy provision of Utah's workers' compensation act. Under the Act, any claims of liability for negligence on the part of an employer are subject to the administrative provisions of the act. Although claims for intentional torts are not covered by the act, Plaintiff's claims for negligent employment are barred. See *Retherford* at FN 8 (suggesting that the exclusive remedy provision bars claims for negligent employment by an employee against her employer). Consequently, the Court should grant summary judgment.

## V.       There is no evidence of outrageous and intolerable behavior sufficient to support a claim for intentional infliction of emotional distress

To assert a cause of action for intentional infliction of emotional distress, Rains must show that Defendants engaged in conduct either a) with the purpose of inflicting emotional distress or b) where any reasonable person would have known that such would result, and that their actions were of "such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality." *Samms. v. Eccles*, 11 Utah 2d 289, 358 P.2d 344, 347 (Utah 1961).

Rains claims that her treatment by Defendants (subjecting her to a contract review and ultimately terminating her) constituted such outrageous behavior. However, as documented herein, Rains' various employment contract reviews were based upon legitimate business concerns regarding her performance as a faculty member. Further, her termination was based upon the fact that she was found liable in the Washington Litigation.

In any event, damages for emotional distress are not recoverable in this case. Mere termination of an employment contract does not rise to the level of outrageous or intolerable conduct by an employer. *Robertson v. Utah Fuel Co.*, 889 P.2d 1382, 1388 (Utah App. 1995). See also *Dubois v. Grand Central*, 872 P.2d 1073, 1078 (Utah App. 1994); *Sperber v. Galigher Ash Co.*, 747 P.2d 1025, 1028 (Utah 1987); *accord Larson v. Sysco Corp.*, 767 P.2d 557, 561 (Utah 1989). "Undoubtedly, every employee who believes he has a legitimate grievance concerning his discharge from employment experiences some emotional anguish as a result of that belief." *Sperber*, 747 P.2d at 1020. The mere fact of discharge, however, is not, as a matter of law, conduct necessary to establish a prima facie claim of emotional distress. *Robertson* at 1389.

Nor can Rains claim intentional infliction of emotional distress stemming from any alleged breach of contract.[1] "Normally there is no recovery of damages for mental anguish stemming from a breach of contract." *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶28. The one narrow exception occurs when the "emotional distress or mental anguish arising from a breach of contract…were both a foreseeable result of the breach of contract and explicitly within the contemplation of the parties at the time the contract was entered into. *Cabaness v. Thomas*, 2010 UT 23, ¶75. To invoke this exception, Rains must point to specific language and obligations in the contract that show that at the time the parties formed the contract they contemplated that emotional distress damages might flow from the breach. *Kranendonk* at ¶29. In other words, she must show that "the parties contemplated granting relief for more than the typical mental anguish and discouragement that results from a breach of contract." *Id.* at ¶30.

Even assuming Westminster breached its contract with Rains, she cannot meet the requirements of *Kranendonk* and *Cabaness*. The faculty manual is devoid of any indication that the parties contemplated relief for a breach of its terms would lead to anything other than "the typical mental anguish and discouragement that results from a breach of contract." Indeed, the Faculty Manual is silent on this question entirely. Consequently, under *Kranendonk* and *Cabaness*, Rains cannot claim intentional infliction of emotion distress for any conduct allegedly stemming from her discharge or breach of her contract with Westminster. Because Westminster's other conduct was reasonable, the Court should grant summary judgment in Westminster's favor on this claim as well.

---

[1] Regarding her claims of gender discrimination, because Westminster had a legitimate business reason for her discharge, Rains cannot by definition show "outrageous and intolerable" conduct.

**VI.**      ***Plaintiffs' defamations claims fail because the allegedly defamatory statements were not made by Westminster, and the statements were substantially true and privileged***

Under Utah law, "to state a claim for defamation, [a plaintiff] must show that [the defendant] published the statements, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damages." *West v. Thomson Newspapers*, 872 P.2d 999, 1007 (Utah 1994) (cleaned up). To succeed in a claim for false light invasion of privacy, a plaintiff must show that 1) the defendant gave publicity to a matter concerning her that places her before the public in a false light; 2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and 3) the defendant had knowledge or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed. *Stien v. Marriott Ownership Resorts*, 944 P.2d 373, 380 (Utah App. 1997).

However, "there are substantial areas of overlap between" defamation and false light claims. *SIRQ, Inc. v. Layton Cos.*, 2016 UT 30, ¶ 50. See also *Jensen v. Sawyers*, 2005 UT 81, para. 48. "Virtually any defamation claim may be recast as an action for false light invasion of privacy." *Id.* At ¶ 54. "For that reason false light claims that arise from defamatory speech raise the same First Amendment concerns as are implicated by the defamation claims." *SIRQ, Inc.* at ¶ 50. Utah statutory and case law provides for absolute privileges and defenses to claims for defamation and false light invasion of privacy. Utah Code § 45-2-3 provides that "a privileged publication or broadcast which shall not be considered as libelous or slanderous per se, is one which is made: (4) by a fair and true report, without malice, of a judicial, legislative, or other official proceeding, or of anything said in the course thereof…"

Further, in Utah, "truth is an absolute defense to an action for defamation." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57 (Utah 1991). "[T]he defense of truth is sufficiently established

if the defamatory charge is true in substance." *Id.* "Insignificant inaccuracies of expression do not defeat the defense of truth." *Id.* At 58. Indeed, "that statements which may be infected with inaccuracies, innuendo, and outright falsity and still not be actionable so long as their 'gist' or 'sting' rings true is but one of the countless ways the law defers to the commanding presence of free expression among our liberties." *Jensen v. Sawyers*, 2005 UT 81, ¶89.

**A.     *The Court should grant Westminster summary judgment because it was not the publisher***

There is no dispute of fact that Westminster was not the publisher of the allegedly defamatory statement in the Chronicle of Higher Education. It is undisputed that Richard Badenhausen wrote the article. See Exhibit E and Exhibit K at pp. 112: 24-25; 113: 1-25; 114: 1-6. Moreover, Mr. Badenhausen testified that the speech in question reflected his own views and that he was not speaking on behalf of Westminster. See Exhibit L. Indeed, he specifically disclaimed his ability to do so. *Id.*

As noted above, to prove defamation a plaintiff must show that the defendant published a defamatory statement. *West v. Thomson Newspapers*, 872 P.2d 999, 1007 (Utah 1994) (cleaned up). To prove false light invasion of privacy, moreover, she must prove that the defendant gave publicity to a private matter. *Stien v. Marriott Ownership Resorts*, 944 P.2d 373, 380 (Utah App. 1997). Rains cannot do so here. She can point to statements of Badenhausen. She cannot point to statements of Westminster. Assuming the statements are defamatory, they are not statements of Westminster, and thus summary judgment should be granted in its favor.

**B.     *The statements are substantially true***

Alternatively, if the statements could somehow be attributed to Westminster, summary judgment is still appropriate because the statements are substantially true. Rains complains that the Chronicle article stated she was "convicted" of "fraud", when in fact she was merely held

liable by a jury after trial for breach of fiduciary duty and violation of the Washington Consumer

Protection Act. There is, however, no dispute of the outcome of the Washington cases. See, e.g.,

Exhibit D. At a jury trial in 2014 Rains was found liable for breach of fiduciary duty. *Rhodes v.*

*Rains*, 2020 Wash App. LEXIS 1727 (Wash. App. 2020)*.* at ¶5.  At a subsequent jury trial in

August 2018, she was found liable for breach of the Washington Consumer Practices Act. *Id.* at

¶7.  Under Washington law, a person cannot be liable for violation of the consumer protection

act unless the plaintiff shows that the defendant engaged in an unfair or deceptive practice.

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn. 2d. 778, 784-85, 719

P.2d 531 (1986). Consequently, there is no dispute of fact that Rains breached fiduciary duties

and engaged in a deceptive or unfair trade practice.

Indeed, the question of whether Rains breached fiduciary duties and violated the

Washington Consumer Protection Act is decisively established under the doctrines of claim

preclusion and collateral estoppel. *Truman v. Johnson*, 60 F.4th 1267, 1272 FN 4 (10th Cir. 2023)

(Federal courts give preclusive effect to state-court judgments whenever the courts of the state

from which the judgments emerged would do so); *Williams v. Leone & Keeble, Inc.*, 171 Wn.2d

726, ¶8 (Wash. 2011) (recognizing collateral estoppel under Washington law when 1) the

identical issue was decided in prior adjudication; 2) the prior adjudication resulted in a final

judgment on the merits 3) collateral estoppel is asserted against the same party, and 4) precluding

relitigating of the issue will not be unjust). All four elements are established under Washington

law, and therefore, Rains is estopped from denying the finality of the adjudications against her.

Rains claims that she was defamed or placed in a false light because the Washington

litigation did not result in a "conviction" for "fraud" against her. She asserts that the technical

difference between a civil finding of liability for breach of fiduciary duty and violation of the

relevant consumer protection act is so significant as to be defamatory and damaging. She is, however, mistaken. Summary judgment should be granted against her.

Under Utah law, perfect accuracy is not required to assert a defense of truth, but only "substantial truth." Statements may indeed be "infected with inaccuracies, innuendo, and outright falsity" so long as the "gist" or "sting" of the allegedly defamatory statement "rings true." *Jensen v. Sawyers*, 2005 UT 81, ¶89. Here, the sting of Badenhausen's statement was that Rains engaged in conduct that was dishonest, untrustworthy, and damaging. Although Rains was not found "guilty" of "fraud" in the sense of having been indicted for criminal fraud and convicted in a criminal court, she was found by a jury of competent jurisdiction (with two affirmations by the Washington Court of Appeals) to have engaged in acts which breached her fiduciary duty, and consisted of a deceptive practice. The "sting" or "gist" is the same. Consequently, the truth of substantial truth applies and summary judgment is appropriate.

Other courts have reached similar conclusions. In *Sivulich v. Howard Publications, Inc.*, a plaintiff sued a newspaper for defamation after it reported that "charges of aggravated battery have been filed against Sivulich." 126 Ill. App. 3d. 129, 130 466 N.E.2d 1218 (Ill. App. 1984). In fact, the plaintiff had only been sued in civil court for civil battery. In dismissing the defamation action, however, *Sivulich* held that

> The natural and ordinary meaning of the word "charged" is broad enough to encompass civil as well as criminal charges. In a generic sense, it includes any assertion against an individual, including averments in a civil complaint. Similarly, while aggravated battery is a defined felony and a term of art, the adjective "aggravated" is commonly understood to describe a more severe act.

As a result, the defense of substantial truth was allowed, even though the newspaper's statement was not technically true. *Id.* Further, courts in other jurisdictions have held that technical errors in legal terminology and reports involving violation of the law are of no legal

consequence. *See Simonson v. UPI, Inc.*, 654 F.2d 478 (7th Cir. 1981) (article reporting person charged with rape when actually charged with second degree sexual assault was not defamatory because statement was not made false by substituting a word in common usage for an exact legalism); *Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 819 P.2d 939 (Ariz. 1991) (newspaper article describing defendant's conviction for "firing a gun" when he was actually convicted of "exhibiting the gun" was not defamatory). See also *Barnett v. Denver Publ'g Co.*, 36 P.3d 145, 148 (10th Cir. 2001) (newspaper report of plaintiff's conviction for "stalking" was substantially true, even though plaintiff was convicted of harassment).

Badenhausen's statements were substantially true. Although there might be legal distinction between criminal fraud and civil breaches of fiduciary duty and consumer protection acts, these errors in legal terminology are of no significance to a truth defense. Indeed, "guilty" and "fraud" are words in common usage to describe 1) the result of a court process adverse to the defendant ("guilty"); and 2) dishonest or deceptive practices ("fraud"). As such, the truth of defense applies and summary judgment should be granted.

The defense of substantial truth applies to the false light claim as well. *Sawyers* notes that the truth defense is necessary in light of constitutional rights to free speech. 2005 UT 81, ¶89. Allowing the defense for defamation but disallowing it for false light claims would encourage re-packaging of defamation claims and defeat the constitutional defense. Further, "there are substantial areas of overlap between" defamation and false light claims. *SIRQ, Inc. v. Layton Cos.*, 2016 UT 30, ¶ 50. See also *Jensen v. Sawyers*, 2005 UT 81, para. 48. "Virtually any defamation claim may be recast as an action for false light invasion of privacy." *Id.* At ¶ 54. "For that reason false light claims that arise from defamatory speech raise the same First Amendment concerns as are implicated by the defamation claims." *SIRQ, Inc.* at ¶ 50.

### C.   *Utah statutory privileges against defamation apply*

Westminster is further entitled to a privilege defense under U.C.A. § 45-2-3. That section provides that "a privileged publication or broadcast which shall not be considered as libelous or slanderous per se, is one which is made: (4) by a fair and true report, without malice, of a judicial, legislative, or other official proceeding, or of anything said in the course thereof…" To qualify for this privilege, "the report [of the proceedings] must accurately reflect the proceedings and the statements or allegations made therein." *Russell v. Thomson Newspapers*, 842 P.2d 896, 902 (Utah 1992). Notably, this privilege does not require that "all individual statements or allegations made in the proceedings must be true for the report to be privileged." *Id.*

For the reasons stated above, Badenhausen's statements are a fair report of the Washington litigation. There is no dispute that a jury held Rains liable for breach of fiduciary duty and breach of the consumer protection act. This constitutes an accurate reflection of the statements and allegations made in the Washington litigation, which was, itself an official judicial proceeding. Consequently, by operation of this statutory privilege, Westminster is entitled to summary judgment on this claim.

CONCLUSION

All Plaintiff's claims fail as a matter of law. Even when giving Plaintiff the benefit of all reasonable inferences from the record, no dispute exists as to the material facts and Defendants are entitled to summary judgment. Plaintiff lacks supportive evidence to each of her claims. She cannot show Westminster breached any portion of her contract, including the implied covenant of good faith and fair dealing. Nor can Plaintiff show that Melissa Koerner violated any statute or other law that would qualify for intentional interference with contractual relations. Plaintiff's federal and state claims for gender and religious discrimination are devoid of any supportive

40

evidence whatsoever. Since Plaintiff cannot show Melissa Koerner violated any duty of care, her claims for negligent employment, supervision, and retention against Westminster fail as a matter of law. Plaintiff has failed to provide any evidentiary support to her claims that any Defendant engaged in outrageous or intolerable behavior, which is required to prove intentional infliction of emotional distress. And finally, the fact that a Washington jury found Plaintiff liable for violating the Washington Consumer Protection Act is an absolute bar to Plaintiff's claims for false light invasion of privacy and defamation. Because there is no genuine dispute over any material facts and all her claims fail as a matter of law, Defendants are entitled to summary judgment.

DATED this 31st of October, 2023.

RENCHER ANJEWIERDEN

/s/ Benjamin K. Lusty
Jaryl L. Rencher
Benjamin K. Lusty
Cami Schiel

**Word Count Certification**

I, Benjamin K. Lusty, certify that this document contains 12,239 words and complies with DUCivR 7-1(a)(4).

/s/      Ben Lusty, October 31, 2023.

**MAILING CERTIFICATE**

I hereby certify that on the 31 day of October, 2023, I caused to be mailed and emailed, a

true and correct copy of the attached and foregoing to the following:

Emily Sharp Rains
4760 S Highland Dr. No. 402
Holladay, UT 84117

mail@emilyrains.com


_____/s/ Benjamin K. Lusty_____
RENCHER|ANJEWIERDEN