UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| EMILY SHARP RAINS,<br><br>Plaintiff,<br><br>v.<br><br>WESTMINSTER COLLEGE; and<br>MELISSA KOERNER,<br><br>Defendants. | **REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC NO. 126), TO DISMISS PLAINTIFF'S STATE LAW CLAIMS FOR LACK OF JURISDICTION, AND TO DENY PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT (DOC NO. 128)**<br><br>Case No. 2:20-cv-00520<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Pro se plaintiff Emily Sharp Rains brought this action against her former employer, Westminster College, and her former supervisor, Melissa Koerner, following the termination of her employment.[1]  Ms. Rains asserts claims against Westminster under Title VII of the Civil Rights Act[2] for retaliation and discrimination on the basis of sex and religion, along with various state-law claims against both defendants. Westminster and Ms. Koerner have filed a motion for summary judgment as to all Ms.

---

[1] (*See* Second Am. Compl. ("Compl."), Doc. No. 62.)

[2] 42 U.S.C. § 2000e et seq.

Rains' claims.[3]  And Ms. Rains filed a motion for partial summary judgment as to her claims for breach of contract and breach of the covenant of good faith and fair dealing.[4]

As the briefs, related filings, and record show,[5] Ms. Rains cannot support her claims of discrimination and retaliation under Title VII—her sole federal claims. Accordingly, as discussed below, the undersigned[6] recommends the district judge grant Westminster and Ms. Koerner's motion for summary judgment as to Ms. Rains' Title VII claims, and dismiss Ms. Rains' remaining claims (which arise from state law) without prejudice.  It is further recommended that the district judge deny Westminster and Ms. Koerner's motion for summary judgment as moot as to Ms. Rains' state-law claims, and deny Ms. Rains' motion for partial summary judgment as moot.

## RELEVANT FACTS[7]

### *The Washington Case and Ms. Rains' Westminster Employment*

Ms. Rains began employment with Westminster in 2013 as an adjunct professor, teaching business and tax law, accounting, and ethics.[8]  At the time, Ms. Rains was a

---

[3] (Defs.' Mot. for Summ. J. ("MSJ"), Doc. No. 126.)

[4] (Pl.'s Partial Mot. for Summ. J., Doc. No. 128.)

[5] No oral argument is necessary; this recommendation is based on the written memoranda.  *See* DUCivR 7-1(g).

[6] On September 15, 2020, District Judge Jill N. Parrish referred this case to the undersigned under 28 U.S.C. § 636(b)(1)(B).  (Doc. No. 19.)

[7] The facts are recounted and construed in the light most favorable to Ms. Rains, *see Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015), and are undisputed, unless otherwise noted.  They are based on the evidence submitted with the summary judgment briefing.  All relevant, admissible evidence in the record is considered for purposes of this report and recommendation.

[8] (MSJ, Statement of Undisputed Material Facts ("SMF") ¶¶ 1, 3, Doc. No. 126.)

licensed attorney with a background in taxation and business law.[9]  As part of the hiring process, Ms. Rains authorized Westminster to conduct a background check, including a check for civil litigation in which she may have been involved.[10]

Starting in 2012 and continuing through her employment with Westminster, Ms. Rains was the defendant in a civil suit in the State of Washington (the "Washington case"), which included claims that Ms. Rains breached her fiduciary duty and violated Washington's Consumer Protection Act.[11]  Westminster claims it was unaware of this case until May 2018 because it only conducted a criminal background check during the hiring process[12] and Ms. Rains did not disclose the Washington case before then.[13] Although Ms. Rains testified she did not recall reporting the case to anyone at

---

[9] (Ex. C to MSJ, Dep. of Emily Sharp Rains ("Rains Dep.") 8:10–13, 8:21–22, Doc. No. 126-5.)

[10] (Pl.'s Mot. in Opp'n to MSJ ("Opp'n") 6, Doc. No. 133 (citing Ex. D to Pl.'s Mot. for Partial Summ. J., Emp. Release Statement, Doc. No. 128-5).)  Westminster and Ms. Koerner object to the document Ms. Rains relies upon in her opposition, arguing (1) she failed to show it is "genuine or authentic," (2) she failed to show it is linked to Westminster or its hiring practices, and (3) the document contains grammatical errors which call its authenticity into question.  (See Defs.' Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. 3–4, Doc. No. 130.)  Ms. Rains responds with her own recollection of receiving the document, signing it, and returning it to Westminster, and includes screenshots of what appears to be a web portal with the referenced document.  (See Decl. of Emily Sharp Rains in Supp. of Pl.'s Reply in Resp. to Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Pl.'s Reply Decl.") ¶¶ 2, 7–8, Doc. No. 140; Ex. 2 to Pl.'s Reply Decl., DocuSign eSignature Portal, Doc. No. 140-2.)  Even assuming the document is admissible, where Ms. Rains fails to identify facts sufficient to establish her claims, the evidentiary objection need not be addressed.

[11] (MSJ, SMF ¶ 5, Doc. No. 126.)

[12] (Id. ¶¶ 11–12; Ex. E to MSJ, Def. Westminster Coll.'s Second Suppl. Resps. to Pl.'s First Set of Disc. Reqs. 6, Doc. No. 126-7.)

[13] (MSJ, SMF ¶¶ 6–7, 10, 12, Doc. No. 126.)

Westminster other than her assistant,[14] she asserts Westminster knew or should have known about it because of the comprehensive background checks she was subjected to and because her wages were garnished as a result of the case.[15]

In April 2014, Westminster hired Ms. Rains as a fulltime assistant accounting professor, anticipating she would also oversee at least one tax-assistance program and its program funds.[16]  The following year, Ms. Koerner became the interim dean.[17]  In the meantime, in August 2014, a jury entered a verdict in the Washington case, finding Ms. Rains breached her fiduciary duties to former clients.[18]  As a result, her Westminster wages were garnished.[19]  Several years later, in August 2018, just before Ms. Rains' termination from Westminster, another jury in the same case found Ms. Rains personally liable for violating Washington's Consumer Protection Act.[20]

---

[14] (Rains Dep. 50:7–19, 51:24–52:3, 53:10–20, Doc. No. 126-5.)  Ms. Rains also testified she worked with unspecified "college employees" to coordinate garnishment of her wages resulting from the Washington case, but she did not recall reporting the jury verdict or findings.  (*Id.* at 50:20–52:3.)

[15] (Opp'n 6, 35–36, Doc. No. 133; Rains Dep. 43:16–18, Doc. No. 126-5.)  Ms. Rains fails to proffer evidence supporting her claim that Westminster actually knew of the Washington case before Ms. Koerner discovered it in 2018.

[16] (MSJ, SMF ¶¶ 1–2, 34, Doc. No. 126.)

[17] *(Id.* ¶ 1.)

[18] (*Id.* ¶ 5; Rains Dep. 45:2–13, Doc. No. 126-5.)

[19] (*See* MSJ, SMF ¶ 9, Doc. No. 126.)  Westminster asserts Ms. Rains never communicated the reason for the garnishments.  (*Id.*)  And Westminster "considered garnishments to be a private matter"; the human resources department did not divulge the existence of garnishments to "academic officers, such as Koerner."  (*Id.*)

[20] (MSJ, SMF ¶¶ 4, 43, Doc. No. 126; Rains Dep. 46:1–19, Doc. No. 126-5); *see also Rhodes v. Rains*, No. 79173-7-I, 2020 Wash. App. LEXIS 2085, at *4 (Wash. Ct. App.

*The Contract Reviews*

At the time of Ms. Rains' employment with Westminster, the school offered new faculty members fulltime, two-year teaching contracts.[21]  At the end of this term, each faculty member was subject to a contract review, after which Westminster could decline to continue the contract, or offer an additional three-year contract or a probationary one-year contract.[22]  Westminster would offer a one-year probationary contract in the case of documented instances of a faculty member's failure to "organize, plan, or execute their teaching responsibilities," among other things.[23]

Per Westminster's Faculty Manual, a contract review entails several steps.[24] First, a committee is formed, composed of a member selected by the faculty member under review, a member selected by the dean, and the faculty member's program chair.[25]  The committee then meets with the dean to discuss the faculty member's performance, reviews the faculty member's file, meets and confers with the faculty member, makes a recommendation about retention, and submits it to the faculty member and dean.[26]  The dean then creates her own report, discussing her evaluation

---

July 27, 2020) (unpublished).  The Washington case involved two separate trials and multiple appeals. *See id.* at *1.

[21] (MSJ, SMF ¶ 13, Doc No. 126.)

[22] (*Id.*; Ex. G to MSJ, 2015-2016 Westminster Coll. Manual for Faculty ("Faculty Manual") § 3.6.11, Doc. No. 127-2.)

[23] (*See* Faculty Manual § 3.6.12(c), Doc. No. 127-2.)

[24] (*See generally id.* § 3.6.)

[25] (*Id.* § 3.6.4.)

[26] (*Id.* §§ 3.6.6–3.6.7.)

of the faculty member, and submits the report and a recommendation to the chief academic officer for final decision.[27]

As part of this process, the faculty member under review prepares a "review file" with "documentation of the faculty member's performance during the time period since their last contract review" or the start of employment.[28]  Committee members also observe the faculty member's teaching activities.[29]  Afterward, the faculty member meets with the committee to "discuss with the faculty member their performance strengths, weaknesses, and provide suggestions for improvement," and the faculty member has the "opportunity to respond to all performance related concerns the peer review committee intends to document" in their report.[30]

Westminster conducted three contract reviews of Ms. Rains between 2015 and 2017.[31]  It conducted the first review as a matter of course.[32]  The committee selected for the first review consisted of Ms. Rains' choice of faculty member, the dean's (Ms. Koerner's) choice of faculty member, and a program chair Ms. Rains reported to, who

---

[27] (*Id.* §§ 3.6.9–3.6.10.)

[28] (*Id.* § 3.6.5.)  This documentation includes things like a current curriculum vitae, syllabi from the courses taught, examination examples, examples of handouts and class materials, a statement of service to Westminster since undergoing the last peer review, and any other relevant materials.  (*See id.* § 3.6.5.1.)

[29] (*Id.* § 3.6.6(b).)

[30] (*Id.* § 3.6.6(c).)

[31] (*See* MSJ, SMF ¶¶ 18–30, Doc. No. 126.)

[32] (*See id.* ¶ 18.)

Ms. Koerner also selected.[33]  The parties dispute why Ms. Koerner selected that program chair (the accountancy chair) to serve on the committee.[34]  Westminster claims Ms. Rains reported to three different chairs at the time of the first review.[35]  Ms. Koerner selected the accountancy chair because she anticipated Ms. Rains would be teaching several courses in the program, and another chair to whom Ms. Rains also reported was new and having "difficulty meeting the requirements of her position."[36]

Ms. Rains claims the accountancy chair was against hiring Ms. Rains initially—because he wanted a male member of the Church of Jesus Christ of Latter-Day Saints ("LDS" or "Mormon") to be selected instead—and he, like Ms. Koerner, wished to terminate Ms. Rains.[37]  Ms. Rains argues Ms. Koerner "stacked" the committee in violation of the Faculty Manual, to influence whether Ms. Rains was offered the three-year contract.[38]  Regardless, the contract review committee proceeded as constituted.[39]

As part of the contract review process, the committee assessed Ms. Rains' "teaching and portfolio," and were happy with Ms. Rains' "service contributions" but

---

[33] (*Id.* ¶ 19.)

[34] This dispute is immaterial because, as discussed below, even if the wrong program chair was selected, Ms. Rains fails to show how it amounted to an adverse employment action.

[35] (MSJ, SMF ¶ 19, Doc. No. 126.)

[36] (*Id.*)

[37] (*See* Opp'n 7–8, Doc. No. 133; *see also* Rains Dep. 169:21–25, Doc. No. 126-5 (stating Ms. Koerner "was in collusion with" the accountancy chair).)

[38] (Opp'n 9–10, Doc. No. 133.)

[39] (*See* MSJ, SMF ¶ 21, Doc. No. 126; Opp'n 9, Doc. No. 133.)

"dissatisfied with her teaching effectiveness and lack of progress in research and publishing."[40]  The committee then gave their report to Ms. Koerner and voted (two to one) to award Ms. Rains a one-year probationary contract.[41]  Ms. Koerner's report focused on Ms. Rains' teaching performance and scholarship, noting concerns about student ratings and Ms. Rains' emphasis on college service versus teaching and scholarship.[42]  Ms. Koerner recommended to the provost and president that Ms. Rains be awarded a one-year probationary contract.[43]  Ultimately, Westminster gave Ms. Rains a probationary contract for a year.[44]

Ms. Rains successfully appealed the results of the first contract review—in part, because of the committee's composition—resulting in a second review.[45]  A new committee was instated in the spring of 2016.[46]  Following this second review, the committee voted (two to one) to offer Ms. Rains a three-year contract.[47]  But Ms.

---

[40] (MSJ, SMF ¶ 21, Doc. No. 126.)

[41] (*Id.*)

[42] (*Id.* ¶¶ 22–23.)

[43] (*Id.* ¶ 24.)

[44] (*Id.*)  There is no indication in the record (or argument from Ms. Rains) that this probationary status resulted in a change in pay or responsibilities, or directly affected Ms. Rains' future opportunities.

[45] (*Id.* ¶¶ 25–26; Opp'n 9–10, Doc. No. 133.)

[46] (*See* MSJ, SMF ¶ 26, Doc. No. 126; Opp'n 10, Doc. No. 133.)

[47] (MSJ, SMF ¶ 26, Doc. No. 126.)

Koerner again recommended a one-year probation contract.[48]  Following the provost's and president's adoption of Ms. Koerner's recommendation, Westminster again awarded Ms. Rains a one-year probationary contract.[49]  At the end of her contract, Westminster conducted another review and the committee again voted in favor of awarding a three-year contract to Ms. Rains.[50]  This time, Ms. Koerner recommended (with some reservations)[51] that Ms. Rains receive the three-year contract, because her teaching had improved.[52]  The provost and president adopted the recommendation and, in the spring of 2018, Westminster awarded Ms. Rains a three-year teaching contract.[53]

---

[48] (*Id.* ¶ 27.)  According to Westminster, Ms. Koerner's recommendation remained the same because Ms. Rains' situation had not significantly changed from the previous review and the committee's report provided no new information.  (*Id.*)

[49] (*Id.*)  Again, there is no indication Ms. Rains' situation changed because of this second review.

[50] (*Id.* ¶ 28.)  Ms. Rains notes that during her probation, she was required to find a mentor, and she asked a faculty member (who Ms. Rains identifies as a white LDS male), (*see* Opp'n 20, Doc. No. 133), because she believed "he would treat her fairly" and "he was friends with the president."  (*Id.* at 10.)  Ms. Rains selected this mentor because she believed that although "[Ms.] Koerner was higher up on the organization chart than [Ms. Rains' mentor, Ms. Koerner] was (after all) a woman and she knew she would not be able to overcome [Ms. Rains' mentor's] influence in the event she attempted to again override the committee's recommendation."  (*Id.*)

[51] (MSJ, SMF ¶¶ 29–30, Doc. No. 126 (noting concern that Ms. Rains "was not placing enough emphasis on her teaching effectiveness and scholarship").)

[52] (*Id.*)

[53] (*Id.* ¶ 30.)

*Ms. Rains' Term of Employment*

During Ms. Rains' employment at Westminster, Ms. Koerner "regularly received complaints" from members of the "college community" about Ms. Rains.[54]  These complaints involved "common themes" of combativeness, failure to "provide advance notice to staff when she required their assistance," and failure to "complete faculty administrative tasks on time."[55]  Ms. Rains expressed hostility towards Ms. Koerner "on several occasions,"[56] and "mismanaged the [tax assistance program]," including failing to "monitor the program's finances closely," operating the tax assistance program "in deficit for nearly an entire year," and submitting "proposals to potential donors that contained operational commitments that had not been approved."[57]

Ms. Rains does not identify as an LDS church member,[58] and contends she was the only non-LDS individual in the accounting department.[59]  Once Ms. Koerner became

---

[54] (*Id.* ¶ 31.)

[55] (*Id.*)

[56] (*Id.* ¶ 33.)

[57] (*Id.* ¶ 34.)

[58] (*See* Opp'n 7, Doc. No. 133.)

[59] (*Id.* at 7, 15, 20.)  In support of this assertion, Ms. Rains cites generally to her own declaration.  (*See, e.g.*, Decl. of Emily Rains in Supp. of Pl.'s Opp'n to Defs.' MSJ ("Rains Decl.") ¶ 16, Doc. No. 134 ("I was the only person in the accounting department that wasn't LDS.").)  When asked how she knew the religious status of her colleagues, Ms. Rains explained that at least one had claimed to be LDS (if not two).  (Rains Dep. 93:15–16; 97:22–25, Doc. No. 126-5.)  Ms. Rains also testified that one faculty member had "indices of his religious affiliation in his office," but she could not recall what those were.  (*Id.* at 91:19–92:9.)  She claimed to know another faculty member was LDS because one of her associates had visited the member's home, "so [the associate] was aware" of that religious affiliation and "might have shared that with" Ms. Rains.  (*Id.* at 92:10–18.)  Ms. Rains understood several others to be LDS because "[p]eople just

the interim dean, Ms. Rains asserts she was "subjected to heightened scrutiny as to every aspect of her work and higher performance standards were imposed on her, as compared to similarly situated male and/or LDS professors."[60]  Further, Ms. Rains explains she was "often deprived" of access to resources "given to other similarly situated males and/or LDS professors."[61]  Ms. Rains contends she was "expected to maintain a meek personality and not to speak up or disagree with . . . any members of the department, especially the men."[62]  During her time at Westminster, Ms. Rains perceived the other members in her department as friendly to each other but, with her, "distant, at best, and at worst, engaged in conduct which was instrumental in creating the hostile work environment that she experienced."[63]

Ms. Rains explains that in 2017 or 2018, she was "next in the rotation" to serve as a department chair but was "passed over" in favor of a female LDS church member.[64]  According to Ms. Rains, Ms. Koerner then "institutionalized the scrutiny and

---

[60] (Opp'n 8, Doc. No. 133.)

knew it," (*id.* at 92:21–23), and with the college located in Salt Lake City, the "chances of someone not being LDS are pretty low," (*id.* at 93:18–20).  Beyond this type of generalized statement, Ms. Rains has provided no evidence supporting the claim that she was the only non-LDS member of the accounting department.

[60] (Opp'n 8, Doc. No. 133.)

[61] (*Id.*)

[62] (*Id.*)

[63] (*Id.* at 9.)

[64] (*Id.* at 17.)

interference with Rains' business law course design" through oversight from a committee headed by that new department chair.[65]

*Ms. Koerner's Investigation and Ms. Rains' Termination*

In May 2018, while preparing files on each faculty member for her successor, Ms. Koerner noticed a self-evaluation in which Ms. Rains reported she was going to argue a case before the Washington Supreme Court.[66]  Wanting to know more, Ms. Koerner searched for the case online and discovered the jury verdict for breach of fiduciary duty against Ms. Rains in the Washington case.[67]  Ms. Koerner was concerned about the nature of the allegations and findings as they "were directly related to the subjects Rains was assigned to teach" and posed a risk to "Westminster's reputation and ethics" from Ms. Rains' continued employment.[68]

Later that same month, in a meeting with Ms. Koerner and the then-interim provost, Ms. Rains learned Ms. Koerner had discovered the Washington case[69]—and

---

[65] (*Id.*)

[66] (MSJ, SMF ¶ 39, Doc. No. 126; Ex. A to MSJ, Aff. of Melissa Koerner ("Koerner Aff.") ¶ 7(a), Doc. No. 126-3; Ex. 3 to Defs.' Reply in Supp. of Mot. for Summ. J., Dep. of Melissa Koerner ("Koerner Dep.") 161:25–162:1, 162:6–12, Doc. No. 144-3.)

[67] (MSJ, SMF ¶ 39, Doc. No. 126; Koerner Aff. ¶ 7(b)–(c), Doc. No. 126-3; Koerner Dep. 162:8–15, 170:2–8, Doc. No. 144-3.)

[68] (MSJ, SMF ¶ 40, Doc. No. 126.)  Ms. Rains does not explicitly dispute this recitation of how Ms. Koerner discovered the first verdict in the Washington case or her resulting concern about Ms. Rains' handling of program funds; instead, Ms. Rains alludes to the notion that Westminster was already aware of the case and Ms. Koerner "dug up" the verdict to justify the investigation.  (*See* Opp'n 5, 24, Doc. No. 133.)  To the extent this constitutes a dispute, it is not genuine because Ms. Rains fails to support her claims of preexisting knowledge with record evidence.

[69] (MSJ, SMF ¶ 41, Doc. No. 126.)  There is a discrepancy between the date Westminster asserts this meeting occurred and the date Ms. Rains references in her

planned to investigate "the accounts and programs that [Ms. Rains] managed."[70]  After learning of the investigation, Ms. Rains complained to the provost of Ms. Koerner's discriminatory and biased treatment of Ms. Rains based on her gender, and requested an investigation into her claims.[71]  Westminster asserts Ms. Rains never complained of discrimination based on her "gender or sex" in the May 2018 meeting, instead limiting her complaints to harassment.[72]  But Westminster acknowledges Ms. Rains asserted "she had been the subject of discrimination" in an August 2018 meeting.[73]

After the May meeting with Ms. Rains, Ms. Koerner reviewed the programs and accounts Ms. Rains managed, and summarized her findings in a report to the provost, before retiring in June.[74]  Westminster then hired an attorney to investigate Ms. Rains'

---

opposition.  (*See id.* ¶¶ 41, 50–51 (indicating the meeting was May 9, 2018); Opp'n 15, 32, Doc. No. 133 (stating Ms. Rains "complained of discrimination" to the provost on May 18, 2018).)  This discrepancy is immaterial because, either way, Ms. Rains reported discrimination before her termination—making it necessary to consider whether Ms. Rains' complaint resulted in her termination.

[70] (MSJ, SMF ¶ 41, Doc. No. 126.)

[71] (*See* Opp'n 32, Doc. No. 133 (stating Ms. Rains reported to the provost that Ms. Koerner "was discriminating against her and requested an investigation"); Rains Dep. 72:15–17, Doc. No. 126-5 (stating she "put [the provost] on notice that I had been discriminated against by [Ms.] Koerner because of my gender").)

[72] (MSJ, SMF ¶ 51, Doc. No. 126.)  The provost testified he did not recall Ms. Rains reporting anything about "adverse actions by [Ms. Koerner] and gender discrimination." (Ex. K to MSJ, Dep. of Richard Badenhausen 71:22–72:15, Doc. No. 127-6.)  And Ms. Koerner testified Ms. Rains did not claim discrimination, though she did claim unfair and biased treatment.  (*See* Koerner Dep. 113:7–114:2, Doc. No. 144-3.)  This dispute is immaterial because even construing facts favorably to Ms. Rains, her retaliation claim fails as a matter of law, as discussed below.

[73] (MSJ, SMF ¶ 52, Doc. No. 126 (internal quotation marks omitted).)

[74] (*Id.* ¶ 42.)

use of program funds.[75]  Following this investigation, and after a second jury found Ms.

Rains violated Washington's Consumer Protection Act in August 2018, Westminster

sent Ms. Rains a notice outlining concerns regarding her use of program funds and the

outcome of the Washington case.[76]  Westminster noted both factors constituted

grounds for dismissal under the terms of the Faculty Manual.[77]  In October 2018,

Westminster gave Ms. Rains written notice of her termination, citing the outcome of the

Washington case as the grounds for her dismissal.[78]

In this case, Ms. Rains raises one federal claim against Westminster College (her

fourth cause of action) alleging the school violated Title VII.[79]  Specifically, Ms. Rains

asserts Westminster subjected her to discriminatory behavior "based on her sex,

religion and protected activity"[80] in the form of hostile work environment and adverse

---

[75] (Opp'n 11–12, Doc. No. 126; Defs.' Reply in Supp. of Mot. for Summ. J. ("Reply") 16, Doc. No. 144; Ex. B to MSJ, Dep. of Bethani Dobkin ("Dobkin Dep.") 133:20–22, Doc. No. 126-4 (confirming an attorney was hired as an "outside investigator").)

[76] (Ex. L to Opp'n, Am. Statement of Concerns, Doc. No. 133-9.)

[77] (*Id.*)  Per the Faculty Manual, a faculty member can be dismissed at any time "when the president, after consultation with the chief academic officer and the dean, believes, in good faith" that the faculty member has (among other things) either "engage[d] in egregious misconduct that places at risk the College's reputation or the credibility or effectiveness of the faculty member as a teacher or colleague," or "violate[d] a federal, state, or city statute, and such violation places at risk the College's reputation."  (Faculty Manual § 3.8.3(d)–(e), Doc. No. 127-2.)

[78] (MSJ, SMF ¶ 43, Doc. No. 126; Ex. M to Opp'n, Westminster Coll. Emp. Dismissal Letter, Doc. No. 133-10 at 1–2.)

[79] (Compl. ¶¶ 98–102, Doc. No. 62.)

[80] (*Id.* ¶ 101.)

employment actions.[81]  Ms. Rains further claims Westminster ignored and failed to investigate her discrimination complaints[82] and retaliated against her by terminating her after she complained of discrimination.[83]  At issue here is Westminster and Ms. Koerner's motion for summary judgment on all Ms. Rains' claims[84] and Ms. Rains' motion for partial summary judgment as to her claims of breach of contract and breach of the covenant of good faith and fair dealing.[85]

## LEGAL STANDARDS

Summary judgment may be granted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[86]  In evaluating a motion for summary judgment, the court views "the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor."[87]  But "where the non moving party will bear the burden of proof at trial on a dispositive issue that party must go beyond the pleadings and

---

[81] (*Id.* ¶¶ 22, 25, 36, 65.)

[82] (*Id.* ¶¶ 100–01.)

[83] (*Id.* ¶ 65.)  As addressed below, Ms. Rains has abandoned her retaliation-resulting-in-termination theory in favor of an argument that Westminster retaliated by failing to investigate her discrimination complaint.  (*See* Opp'n 32–33, Doc. No. 133.)

[84] (MSJ, Doc. No. 126.)

[85] (Pl.'s Partial Mot. for Summ. J., Doc. No. 128.)

[86] Fed. R. Civ. P. 56(a).

[87] *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment."[88]

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."[89]  A party asserting that a "fact" cannot be or is genuinely disputed on summary judgment must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."[90]  This means "unsupported conclusory allegations do not create a genuine issue of fact,"[91] and "mere speculation, conjecture, or surmise" cannot withstand a motion for summary judgment.[92]  Furthermore, "[t]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is genuine."[93]

---

[88] *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (internal quotation marks omitted).

[89] *Jones v. Norton*, 809 F.3d at 573 (internal quotation marks omitted).

[90] Fed. R. Civ. P. 56(c)(1).

[91] *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) (internal alterations and citation omitted).

[92] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[93] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (internal quotation marks omitted).

Generally, pro se filings are liberally construed and held "to a less stringent standard than formal pleadings drafted by lawyers."[94]  Ms. Rains, however, is a lawyer by training.  But even assuming a less stringent standard applies to her, pro se plaintiffs must "follow the same rules of procedure that govern other litigants."[95]  For instance, a pro se plaintiff "still has the burden of alleging sufficient facts on which a recognized legal claim could be based."[96]  While the court must make some allowances for a pro se plaintiff's "failure to cite proper legal authority, [her] confusion of various legal theories, . . . or [her] unfamiliarity with pleading requirements,"[97] the court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[98]

## ANALYSIS

Westminster moves for summary judgment on Ms. Rains' Title VII claim of discrimination, asserting she was terminated because of the outcome of the Washington case, not because of her sex or religion.[99]  Westminster also moves for summary judgment on Ms. Rains' Title VII claim of retaliation, contending she faced no retaliation

---

[94] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[95] *Garrett v. Selby, Connor, Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

[96] *Jenkins v. Currier*, 514 F.3d 1030, 1032 (10th Cir. 2008) (internal quotation marks omitted).

[97] *Hall*, 935 F.2d at 1110.

[98] *Smith v. United States*, 561 F.3d 1090, 1096 (10th Cir. 2009) (internal quotation marks omitted).

[99] (MSJ 27, Doc. No. 126.)

for complaining of discrimination[100] or through any failure by Westminster to investigate her allegations of discrimination.[101]  Each issue is addressed in turn.

At the outset, where Westminster and Ms. Koerner object to portions of the declarations filed in support of Ms. Rains' opposition,[102] the record is assessed with standards of admissibility in mind.  Under Rule 56 of the Federal Rules of Civil Procedure, a "declaration used to support or oppose a motion must be made on personal knowledge" and "set out facts admissible in evidence."[103]  If a declarant "could not have actually perceived or observed that which he testifies to," a declaration is inadmissible.[104]  Likewise, "[h]earsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because a third party's description of a witness' supposed testimony is not suitable grist for the summary

---

[100] (*Id.* at 22.)

[101] (Reply 38–39, Doc. No. 144.)  As Westminster notes in its reply, (*see id.* at 38), Ms. Rains initially argued she was terminated in retaliation for reporting discrimination.  (*See* Compl. ¶ 65, Doc. No. 62.)  However, Ms. Rains appears to abandon that theory in her response to Westminster's motion, instead arguing Westminster retaliated by failing to investigate her reports of discrimination.  (*See* Opp'n. 32–33, Doc. No. 133 (arguing Westminster "has not proffered a legitimate reason for the failure to investigate her discrimination complaint").)  Under either theory, Ms. Rains' retaliation claim fails as a matter of law, as discussed below.

[102] (*See* Defs.' Objs., Doc. No. 145.)  Westminster and Ms. Koerner object under Rules 602, 801, and 802 of the Federal Rules of Evidence.  (*See* Reply 2–3, Doc. No. 144 (noting the declarations filed by Ms. Rains "consist nearly entirely of materials to which Defendants object"); Defs.' Objs., Doc. No. 145.)

[103] Fed. R. Civ. P. 56(c)(4).

[104] *Wilmington Sav. Fund Soc'y, FSB v. Hutchins*, No. CV 18-0346, 2020 U.S. Dist. LEXIS 68835, at *11 (D.N.M. Apr. 20, 2020) (unpublished) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2012)).  This standard arises from the Federal Rules of Evidence.  *See id.* ("Rule 56(c)(4)'s personal knowledge requirement is construed in tandem with rule 602 of the Federal Rules of Evidence.").

judgment mill."[105]  It is unnecessary to address Westminster and Ms. Koerner's objections individually because the evidence submitted with the motion and opposition is reviewed consistent with these standards.

I.   <u>Discrimination</u>

In her federal discrimination claim, Ms. Rains asserts she was subject to a hostile work environment and adverse employment actions[106] "based on her sex, religion and protected activity."[107]  Title VII prohibits employers from discriminating on the basis of "race, color, religion, sex, or national origin."[108]  To prevail on a discrimination claim, the "plaintiff bears the ultimate burden of proving her employer intentionally discriminated against her" through either direct or circumstantial evidence.[109]  If a party relies on circumstantial evidence (as Ms. Rains does), the burden-shifting framework in *McDonnell Douglas Corp. v. Green*[110] applies.[111]  Under this framework, the plaintiff must establish a prima facie case of discrimination by demonstrating, "by a preponderance of the evidence," that (1) "she is a member of a protected class"; (2)

---

[105] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (internal quotation marks omitted).

[106] (Compl. ¶¶ 22, 25, 36, Doc. No. 62.)

[107] *(Id.* ¶ 101.)

[108] 42 U.S.C. § 2000e-2(a)(1).

[109] *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015); *see also Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) ("To prevail on a Title VII discrimination claim, the plaintiff bears the ultimate burden of proving intentional discrimination by the employer.").

[110] 411 U.S. 792, 802–05 (1973).

[111] *See Singh*, 936 F.3d at 1037.

"she suffered an adverse employment action"; and (3) "the challenged action occurred under circumstances giving rise to an inference of discrimination."[112]

If the plaintiff can establish a prima facie case of discrimination, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions."[113]  If the employer does so, the burden shifts back "to the plaintiff to show that the defendant's explanation was merely pretextual."[114]  To determine pretext, the court considers

> whether the employer's stated reasons were held in good faith at the time of the [challenged action], even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent, or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination.[115]

Typically, a plaintiff can establish pretext one of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy . . . ; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice.[116]

Ultimately, the "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[117]

---

[112] *Bennett*, 792 F.3d at 1266.

[113] *Id.*

[114] *Id.*

[115] *Simmons v. Sykes Enters.*, 647 F.3d 943, 947–48 (10th Cir. 2011) (citation omitted).

[116] *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (citations omitted).

[117] *Bones*, 366 F.3d at 875.

There is no dispute Ms. Rains is a member of a protected class: she is a woman and not a member of the LDS church.  The question is whether she faced an adverse employment action "under circumstances which give rise to an inference of unlawful discrimination."[118]  Ms. Rains argues various events constituted adverse employment actions:

- the contract review process "*after* Ms. Koerner became interim dean";[119]

- being "passed over" as chair of the accounting department;[120]

- the investigation Ms. Koerner instigated in May 2018;[121] and

- Ms. Rains' termination.[122]

Ms. Rains also asserts Ms. Koerner abused her position as interim dean "to create a severe and pervasive hostile work environment"[123] and was "unchecked by those with authority over her."[124]

---

[118] *Kendrick*, 220 F.3d at 1227 ("The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981))).

[119] (Opp'n 23, Doc. No. 133.)

[120] (*Id.*)

[121] (*Id.* at 23–24.)

[122] (*Id.* at 22, 24.)

[123] (*Id.* at 28.)

[124] (*Id.* at 11.)

A. *Challenged Actions*

Ms. Rains asserts she suffered eight specific adverse employment actions during her time at Westminster.[125]  She claims five events during the contract review process amounted to adverse employment actions.[126]  Ms. Rains contends the sixth adverse employment action occurred when Ms. Koerner selected another woman (who Ms. Rains asserts is an LDS church member) instead of Ms. Rains, to be the department chair—outside the normal "rotation."[127]  Ms. Rains claims Ms. Koerner's investigation into her constitutes the seventh adverse employment action.[128]  And the final adverse action was her termination.[129]

Adverse employment actions generally require "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[130]  Although "not necessarily limited to such acts,"[131] "not everything that makes an employee unhappy is an actionable adverse action."[132]  "Actions that have

---

[125] (*Id.* at 22–24.)

[126] (*Id.* at 23.)

[127] (*Id.*)

[128] (*Id.* at 23–24.)

[129] (*Id.* at 22, 24.)

[130] *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (citation omitted); *see also Brown v. Austin*, 13 F.4th 1079, 1092 (10th Cir. 2021) ("An adverse employment action is one that causes a significant change in employment status or benefits.").

[131] *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011).

[132] *MacKenzie v. Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (citation omitted).

only a de minimis impact on an employee's future opportunities are not adverse under Title VII."[133]  "Likewise, a mere inconvenience or an alteration of job responsibilities does not rise to the level of an adverse action."[134]  A plaintiff's "burden at the prima facie stage is not onerous," [135] but she must present "objective evidence of material disadvantage."[136]

As discussed below, only one action Ms. Rains challenges qualifies as an adverse employment action: her termination.

### i.    Contract Review Process (First Five Challenged Actions)

Ms. Rains asserts she suffered five adverse employment actions during the contract review process.[137]  Even construing the facts in Ms. Rains' favor, the events she challenges do not amount to adverse employment actions.

### a.    Committee Composition and Subsequent Reviews (First, Second, and Fifth Challenged Actions)

Ms. Rains first asserts Ms. Koerner violated Westminster's policies by appointing an LDS male program chair to the initial review committee, resulting in a vote that Ms.

---

[133] *Alfonso v. SCC Pueblo Belmont Operating Co.*, 912 F. Supp. 2d 1018, 1029 (D. Colo. 2012); *see also Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 605 (10th Cir. 2019) (unpublished) ("A strong indicator that a challenged employment action is adverse is that the action causes harm to future employment prospects." (internal quotation marks omitted)).

[134] *Alfonso*, 912 F. Supp. 2d at 1029 (internal quotation marks omitted).

[135] *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1222 (10th Cir. 2022) (internal quotation marks omitted).

[136] *Id.* (citation omitted).

[137] (Opp'n 22–23, Doc. No. 133.)

Rains be given a probationary contract.[138]  Second, Ms. Rains contends that after her successful appeal, she was "forced to undergo" the review process again while maintaining her workload as a faculty member.[139]  In the same vein, Ms. Rains asserts her third contract review constituted an adverse employment action because she had to maintain her workload through the third review.[140]  But Ms. Rains has failed to establish these events amount to adverse employment actions.  She has not shown any "'significant change in employment status,' such as termination, a decrease in pay, a reassignment with markedly different responsibilities, or 'a decision causing a significant change in benefits.'"[141]  Ms. Rains has not submitted evidence showing a significant change occurred.

First, neither the initial committee's composition nor the result of the first contract review resulted in a change (let alone a significant change), in Ms. Rains' employment status.  Upon review, the Faculty Affairs Committee agreed the initial composition was wrong, and recommended a new committee complete another review.[142]  Moreover, the outcome of the first contract review had no significant effect on Ms. Rains' employment status; Ms. Rains has not identified evidence showing her position or responsibilities

---

[138] (*Id.* at 23.)

[139] (*Id.*)

[140] (*Id.*)

[141] *Clayton v. Dreamstyle Remodeling of Colo., LLC*, No. 20-cv-02096, 2022 U.S. Dist. LEXIS 57074, at *43 (D. Colo. Mar. 28, 2022) (unpublished) (quoting *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012)).

[142] (*See* MSJ ¶ 25, Doc. No. 126; Opp'n 23, Doc. No. 133.)

changed as a result of the first review.[143]   Indeed, Ms. Rains acknowledges her

responsibilities remained the same while she prepared for the second and third contract

reviews.[144]   Ms. Rains has not shown the process impacted her employment status or

that, for example, her position, title, workload, or benefits changed.   At most, she was

subject to the inconvenience of preparing for additional reviews.   But "[a] mere

inconvenience . . . does not qualify as an adverse action."[145]   In other words, Ms. Rains

has failed to show "the alleged adverse action caused more than *de minimis* harm to or

a *de minimis* impact upon [her] job opportunities or status."[146]   Because Ms. Rains'

employment status was unaffected by these three actions, they do not amount to

adverse employment actions within the meaning of Title VII.

> b.  Probationary Contract and Probationary Period (Third and Fourth
>     Challenged Actions)

Ms. Rains' third and fourth challenged actions are considered together, as they

are connected.   Ms. Rains asserts the third adverse employment action occurred when

Ms. Koerner recommended a probationary contract and Westminster followed the

recommendation, even after the second committee voted in favor of a three-year

contract.[147]   And Ms. Rains claims the fourth adverse employment action was her actual

---

[143] *See Hampton v. Utah Dep't of Corr.*, 87 F.4th 1183, 1199 (10th Cir. 2023)
("[A]lteration of responsibilities alone does not make an employment action adverse.").

[144] (Opp'n 9, 23, Doc. No. 133.)

[145] *Hiatt*, 858 F.3d at 1316 (internal quotation marks omitted).

[146] *C.R. Eng., Inc.*, 644 F.3d at 1040 (internal quotation marks omitted).

[147] (Opp'n 23, Doc. No. 133.)

period of probation.[148]  However, Ms. Rains has failed to show these challenged actions affected her employment status for purposes of being considered adverse actions.

Ms. Rains' claim that Westminster essentially rubber-stamped Ms. Koerner's probation recommendation does not, alone, amount to an adverse employment action—because it did not alter the status of Ms. Rains' employment.  Even Ms. Rains' subsequent placement on probation is insufficient.  Whether an employment action is adverse hinges on whether it constitutes "a significant change in employment status."[149] While the Tenth Circuit has not directly decided whether being placed on probation amounts to an adverse employment action for purposes of making a prima facie discrimination claim, the Tenth Circuit holds "a [performance improvement plan], standing alone, is not an adverse employment action" unless "it effects a significant change in the plaintiff's employment status."[150]  And many other jurisdictions agree probation alone does not constitute an adverse employment action.[151]  To be an

---

[148] (*Id.*)

[149] *Hiatt,* 858 F.3d at 1316.

[150] *Ford*, 45 F.4th at 1226 (citations omitted).

[151] *See, e.g.*, *Stewart v. Missouri Pac. R.R. Co.*, 121 F. App'x 558, 562–63 (5th Cir. 2005) (unpublished) (holding probation did not amount to an adverse employment action because it "did nothing to alter [the] employment status" of the plaintiffs who "received the same pay and held the same job responsibilities"); *Craig-Wood v. Time Warner NY Cable LLC*, No. 2:10-cv-906, 2012 U.S. Dist. LEXIS 128039, at *21–22 (S.D. Ohio Sept. 10, 2012) (unpublished) (finding a six-month disciplinary probation was not an adverse employment action because the plaintiff's "job responsibilities, title, and compensation were unaffected by the probation"); *Cornelius v. City of Columbia*, 663 F. Supp. 2d 471, 476–77 (D.S.C. Sept. 29, 2009) (finding probation was not an adverse employment action where the plaintiff failed to establish it affected any terms, benefits, or conditions of employment); *Miller v. Salvation Army*, No. 1:04-CV-1821, 2005 U.S. Dist. LEXIS 57450, at *22 (N.D. Ga. Oct. 4, 2005) (unpublished) (finding that a ninety-day probation was not an adverse employment action because the "probation did not

adverse action, the probation must be coupled with a significant change to employment status.

For example, *Stewart v. Missouri Pacific Railroad Co.*[152] dealt with an employer that put the plaintiffs on probation for a year for violating policy.[153]  The district court concluded this did not qualify as an adverse action because "neither [plaintiff] faced termination, demotion, or a loss of benefits" as a result.[154]  On appeal, the Fifth Circuit affirmed, explaining the probation "did nothing to alter their employment status," as the plaintiffs "received the same pay and held the same job responsibilities."[155]

Here, Ms. Rains has not identified evidence showing she suffered from any substantive change in her employment as a result of her probation—such as a change in responsibilities, pay, or leave.  Although she asserted "the next step would have been

---

involve any reduction in Plaintiff's pay" or a change in "benefits, responsibilities or status"); *see also Amos v. McNairy Cnty.*, 622 F. App'x 529, 534 n.3 (6th Cir. 2015) (unpublished) (noting that while the Sixth Circuit has not "explicitly addressed whether probation is an adverse employment action in the context of discrimination," other things such as "performance improvement plan[s] and non-satisfactory work reviews, absent some loss in salary, title, or benefits, did not rise to the level of" adverse employment action); *cf. Shapiro v. Howard Univ.*, No. 18-cv-2588, 2019 U.S. Dist. LEXIS 169944, at *37–38 (D.D.C. Sept. 30, 2019) (unpublished) (finding probation to be an adverse employment action where it affected the plaintiff's ability to maintain or to secure employment in her chosen field); *Alexander v. Univ. of Ky.*, No. 5:10-CV-48, 2012 U.S. Dist. LEXIS 46173, at *37 (E.D. Ky. Mar. 28, 2012) (unpublished) (finding probation to be an adverse employment action where the plaintiff was unable to use vacation time while on probation, which constituted a "loss of benefits").

[152] 121 F. App'x 558.

[153] *Id.* at 560.

[154] *Id.* at 562.

[155] *Id.* at 562–63.

termination,"[156] Ms. Rains has failed to point to record evidence showing the probation itself altered or affected her job status or future job opportunities.  Indeed, Ms. Rains obtained her goal of a three-year contract following her third contract review.[157] Accordingly, the third and fourth challenged actions do not qualify as adverse employment actions.

In sum, even construed in Ms. Rain's favor, the evidence is insufficient to support a finding that Ms. Rains suffered an adverse employment action during the contract review process.

### ii.   Failure to Obtain Department Chair Position (Sixth Challenged Action)

Ms. Rains contends she suffered a sixth adverse employment action when Ms. Koerner selected another woman—who Ms. Rains asserts was an LDS church member[158]—to be the department chair outside the normal "rotation" of faculty members.[159]  Although Ms. Rains' "burden at the prima facie stage is not onerous," she has failed to point to "objective evidence of material disadvantage."[160]  Ms. Rains has

---

[156] (Opp'n 23, Doc. No. 133.)

[157] (*See* MSJ, SMF ¶ 30, Doc. No. 126.)  Ms. Rains claims she received a three-year contract because her male LDS mentor somehow influenced the third committee into voting favorably, thereby thwarting Ms. Koerner's termination scheme.  (*See* Opp'n 10, 23–24, Doc. No. 133.)

[158] The only support for this assertion is Ms. Rains' assumption, based on an observation of the individual holding an "LDS Bible" or having it in her office.  (*See* Rains Dep. 92:24–93:3, Doc. No. 126-5.)  But Ms. Rains could not recall anything else supporting her "knowledge" of the religious leanings of this individual.  (*See id.* at 93:4–5.)

[159] (Opp'n 23, Doc. No. 133.)

[160] *Ford*, 45 F.4th at 1222 (internal quotation marks omitted).

neglected to argue (or offer facts showing) Ms. Koerner's chair selection had any effect—beyond frustration to Ms. Rains—on Ms. Rains' employment, responsibilities, or future opportunities.  Nor does Ms. Rains proffer evidence supporting her claim that she was entitled to the position as next in the rotation, or that Westminster even used a rotation-based system.  Indeed, the Faculty Manual suggests otherwise, indicating program chairs are "elected by the faculty of each program and/or appointed by the dean."[161]  Ms. Rains has thus failed to identify any evidence showing the selection of another individual as chair amounts to an adverse employment action.

### iii.   Investigation (Seventh Challenged Action)

Next, Ms. Rains asserts the 2018 investigation into her use of program funds amounted to an adverse employment action.[162]  But Ms. Rains fails to identify facts supporting her claim.

"The Tenth Circuit has never squarely decided whether a workplace investigation is an adverse action, explaining that context matters in making that determination."[163]  Accordingly, it helps to consider how other district courts have evaluated this issue.  In *Owens v. Unified Government of Wyandotte County*,[164] for instance, an employer received an anonymous tip that the plaintiff was violating employee residency

---

[161] (Faculty Manual § 2.9.1, Doc. No. 127-2.)

[162] (Opp'n 23, Doc. No. 133.)

[163] *Owens v. Unified Gov't of Wyandotte Cnty.*, No. 21-2185, 2022 U.S. Dist. LEXIS 106267, at *24 (D. Kan. June 14, 2022) (unpublished).

[164] 2022 U.S. Dist. LEXIS 106267.

requirements.[165]  A compliance coordinator began an investigation, hiring a private investigator to surveil the plaintiff.[166]  Following a contentious meeting between the human resources director and compliance coordinator, the plaintiff provided extensive documentation confirming his residency within boundaries while the compliance coordinator submitted her own report disputing his residency claims.[167]  Roughly four months later, after the compliance coordinator had the plaintiff surveilled three more times (costing the employer more money than had ever been spent to conduct surveillance), another meeting was held.[168]  Approximately six months after this second meeting, the investigation concluded with no disciplinary action.[169]  The plaintiff was never suspended, and his employment, pay, and working hours never changed.[170]

The *Owens* court concluded the plaintiff had raised a genuine issue of material fact as to whether the investigation amounted to an adverse action for several reasons, including: (1) the investigation continued unnecessarily, (2) it was so extensive, it lasted ten months after the plaintiff provided documentation showing he met the residency requirement, (3) the comparative cost of the investigation was significant, and (4) it potentially damaged the "plaintiff's reputation and significantly risk[ed] humiliation."[171]

---

[165] *Id.* at *7–8.

[166] *Id.* at *8–9.

[167] *Id.* at *9–13.

[168] *Id.* at *13–14.

[169] *Id.* at *18.

[170] *Id.* at *19.

[171] *Id.* at *24–25.

The investigation into Ms. Rains' handling of program funds does not rise to the level in *Owens*.  First, the investigation lasted about six weeks.[172]  While duration of an investigation is not a definitive barometer of whether an adverse employment action occurred, six weeks was not unreasonable; it did not leave Ms. Rains in a prolonged state of uncertainty (as in *Owens*).  Next, Ms. Rains' assertion that this type of investigation was "unheard of"[173] is supported only by her own declaration[174] (which is insufficient, without more, to establish an adverse employment action).

Much like the other actions she challenges, Ms. Rains has not identified evidence indicating her employment status changed during the investigation—for example, that her pay, benefits, responsibilities, or hours were affected.  Although Ms. Rains argues the investigation humiliated her and damaged her reputation,[175] she offers no facts supporting these claims.[176]  In support of her assertions, Ms. Rains cites to a portion of a deposition by Westminster's then-president, but that portion does not relate to her

---

[172] The meeting at which Ms. Rains was informed Westminster was launching the investigation was held on May 9, 2018, (*see* Opp'n 11, Doc. No. 133), and Ms. Koerner's report was dated June 18, 2018.  (*See* Ex. F to Opp'n, Koerner's Summ. of Investigation into Rains' Mgmt. of Grants, Donated Funds, and Related Projects ("Koerner's Report"), Doc. No. 133-3.)

[173] (Opp'n 11, Doc. No. 133.)

[174] (*See id.*)  Ms. Rains cites to the entirety of her declaration in support of this claim, but her declaration does not contain any statement that this type of investigation was "unheard of."

[175] (*Id.* at 14.)

[176] Ms. Rains states only that the investigation caused "great distress, embarrassment, and actual injury to her reputation with students, colleagues, donors, [and] partners, during the several months that the College's investigations were going on."  (*Id.*)

reputational claim.[177]  Ms. Rains also cites to the entirety of her own declaration, which contains no evidence of reputational damage or humiliation.  In her declaration, Ms. Rains states only: "I was pretty upset," "[i]t was too much," and "[t]he whole thing was awful."[178]  But "humiliation alone is not enough to clearly establish an adverse employment action."[179]  Where Ms. Rains has not supported her claim with evidence that her reputation was damaged by the investigation, the investigation does not amount to an adverse employment action.  Nevertheless, where Westminster cited the investigation as a potential ground for dismissal in a notice to Ms. Rains, preceding her termination, the remainder of the *McDonnell Douglas* framework is considered.

### a.  Inference of Discrimination

Even if Ms. Rains could establish the investigation was an adverse action, she has "failed to produce proof of circumstances giving rise to an inference of unlawful discrimination."[180]  "An inference of discrimination can arise from an employer's favoritism toward a similarly situated employee who is not part of the protected class."[181]  "Individuals are considered 'similarly situated' when they deal with the same

---

[177] (*Id.* (citing Dobkin Dep.114:6–13, Doc. No. 126-4).)

[178] (Rains Decl. ¶ 28, Doc. No. 134.)

[179] *See Lincoln v. Maketa*, 880 F.3d 533, 543 (10th Cir. 2018) (explaining that humiliation may be considered "*along with* damage to reputation and harm to future employment prospects" (emphasis added)).

[180] *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1183 (10th Cir. 2002).

[181] *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).

supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of comparable seriousness."[182]

Ms. Rains fails to explicitly address this prima facie prong, instead skipping to the pretext step of the *McDonnel Douglas* framework.[183]  Peppered throughout her opposition are claims that "she was routinely treated differently than her male and LDS colleagues."[184]  Even assuming these statements reflect Ms. Rains' attempt to establish an inference of discrimination, her attempt fails because her assertions are supported only by her own conclusory statements.  In support of her assertions, Ms. Rains cites to the entirely of her own declaration.[185]  But affidavits and declarations "must contain a certain indicia of reliability," and "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings."[186]  A nonmovant's allegations "must be based on more than mere speculation, conjecture, or surmise," and statements in a declaration "must set forth facts that would be admissible in evidence."[187]  The court does "not consider conclusory and self-serving affidavits."[188]

---

[182] *EEOC v. PVNF, LLC*, 487 F.3d 790, 801 (10th Cir. 2007) (citation omitted).

[183] (*See* Opp'n 24–28, Doc. No. 133.)

[184] (*Id.* at 17; *see also id.* at 2, 18, 20 (alleging she was treated less favorably than male LDS colleagues.)

[185] (*See id.* at 17.)

[186] *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (citation omitted).

[187] *Id.* (citation omitted).

[188] *Id.* (citation omitted).

In her declaration, Ms. Rains asserts, for instance, that one colleague was not "subjected to enrollment minimums" like she was;[189] another (an entrepreneurship professor) was provided "funds from the school budget to support his program" while Ms. Rains had to raise funds for her programs;[190] a previous tax program director was able to make more unilateral decisions over program's funds than Ms. Rains;[191] an LDS male colleague earned academic credit for writing his articles while Ms. Rains did not;[192] a proposal originally submitted by an unnamed male colleague was "flagged and rejected" by Ms. Koerner when Ms. Rains was added to it;[193] and a male LDS professor who had been "verbally violent" was "subsequently promoted."[194]  But Ms. Rains identifies no factual support for these assertions, nor does she establish these individuals were similarly situated such that discrimination may be inferred.  Where Ms. Rains' assertions consist of unsubstantiated allegations, they are insufficient to establish an inference of discrimination.

### b.  Legitimate Nondiscriminatory Reason and Pretext

Even if Ms. Rains could establish a prima facie case of discrimination based on the investigation, Westminster has articulated "a legitimate, nondiscriminatory reason

---

[189] (Rains Decl. ¶ 37, Doc. No. 134.)

[190] (*Id.* ¶ 38.)

[191] (*Id.* ¶ 40.)

[192] (*Id.* ¶ 42.)

[193] (*Id.* ¶ 43.)

[194] (*Id.* ¶ 44.)

for its actions."[195]  According to Westminster, Ms. Koerner initiated the investigation

after learning of the Washington case in May 2018.[196]  Ms. Koerner explains she was

concerned the allegations and findings in the Washington case—including a finding of

Ms. Rains' liability for breach of fiduciary duty—were related to subjects Ms. Rains was

assigned to teach.[197]  Ms. Koerner also states she personally witnessed conduct by Ms.

Rains at Westminster which mirrored conduct described in the Washington case.[198]

Based on these concerns, Ms. Koerner initiated the investigation into Ms. Rains'

management of college accounts and programs.[199]

Where Westminster has proffered a legitimate reason for the investigation, to

survive Westminster's motion of summary judgment, Ms. Rains must point to evidence

showing this reason is pretextual.[200]  She fails to do so.  Although Ms. Rains contends

---

[195] *Bennett*, 792 F.3d at 1266.

[196] (MSJ, SMF ¶¶ 39–41, Doc. No. 126; Koerner Decl. ¶¶ 7, 9, Doc. No. 126-3.)

[197] (*See* MSJ, SMF ¶ 40, Doc. No. 126; Koerner Decl. ¶ 9(b), Doc. No. 126-3.)  These subjects included business law, accounting, tax law, and ethics.  (*See* Koerner Decl. ¶ 9(b), Doc. No. 126-3.)

[198] (*See* MSJ, SMF ¶ 40, Doc. No. 126; Koerner Decl. ¶ 9(d), Doc. No. 126-3.) Specifically, Ms. Koerner asserts Ms. Rains misrepresented that fundraising was going well, admonished donors for voicing concerns, and had a "disorganized and careless" approach to managing program finances and personnel—and Ms. Koerner compares this to conduct described in an appellate opinion in the Washington case.  (Koerner Decl. ¶ 9(d), Doc. No. 126-3.)

[199] (MSJ, SMF ¶¶ 40–42, Doc. No. 126; Koerner Decl. ¶ 9, Doc. No. 126-3.)

[200] *See Jones v. Denver Post Corp.*, 203 F.3d 748, 756 (10th Cir. 2000) ("To survive summary judgment, [a plaintiff] must demonstrate that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief." (internal quotation marks omitted)).

the record contains an "abundance of evidence of pretext,"[201] she does not identify specific evidence or explain how it shows pretext.  Instead, she summarizes cases where courts discuss methods for demonstrating pretext—without addressing whether or how the cases apply here.[202]

Even giving Ms. Rains the benefit of leniency as a pro se plaintiff, it is not apparent from the record how Ms. Rains could support a claim of pretext.  "To establish pretext, [a plaintiff] must present evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[203]  "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."[204]

Ms. Rains' argument consists of mere conjecture.  She contends Westminster's proffered reason for the investigation is false[205] by claiming Westminster already knew

---

[201] (Opp'n 24, Doc. No. 133.)

[202] (*Id.* at 24–28.)  It is unclear whether the pretext portion of Ms. Rains' opposition alludes to the investigation, termination, or both, but Ms. Rains challenges Westminster's stated reasons for the investigation throughout her brief.

[203] *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (internal quotation marks omitted).

[204] *Anupama Bekkem v. Wilkie*, 915 F.3d 1258, 1268 (10th Cir. 2019) (citation omitted).

[205] (*See* Opp'n 2, Doc. No. 133 (Westminster's "proffered reasons for the adverse actions, including the termination, are mere pretext"); *id.* at 13 ("[N]o investigation was needed to uncover the jury verdicts.  They were a matter of public record.").)

of the Washington case when Ms. Rains was hired—then imputing that knowledge to Ms. Koerner.[206]  In support of her claim that Westminster and/or Ms. Koerner knew of the Washington case previously, Ms. Rains relies on her two background checks (which permitted a check of civil litigation),[207] and her wage garnishment related to the litigation.[208]  But Ms. Rains has not identified evidence showing Westminster or Ms. Koerner actually knew of the Washington case until shortly before Ms. Koerner initiated the investigation; she has not supported the inferences she wishes the court to make. In the context of the wage garnishment alone, the court would have to assume:

- the human resources department knew why Ms. Rains' wages were being garnished,

- this information was communicated to Ms. Koerner, and

- despite Ms. Koerner's alleged persistent discriminatory treatment and goal to terminate Ms. Rains, Ms. Koerner—with knowledge of the Washington case— inexplicably refrained from investigating Ms. Rains until May 2018.

This requires too may unsupported assumptions.  Without some substantiation, it amounts to nothing more than conjecture.

---

[206] (*See id.* at 24 ("[Ms.] Koerner dug up the jury verdict in the Washington Case."); *id.* at 36 ("It wasn't until [Ms.] Koerner, as part of her crusade against [Ms.] Rains, suggested . . . that she investigate [Ms.] Rains and her programs based on the existence of the Washington Case, that anyone ever expressed any concern . . . .").)

[207] (*See id.* at 36 ("After performing the background check and learning about the Washington Case, the College could have simply chosen not to move forward with[ ] [Ms.] Rains's employment or they could have conditioned her future employment on the outcome of the Washington Case.  Instead, the College was silent on the topic and gave [Ms.] Rains the greenlight to move forward as a faculty member.").)

[208] (*See id.* ("Even after [Ms.] Rains's wages were garnished for almost 18 months, the College said nothing.").)

With respect to the background checks, Ms. Rains invites the court to assume that simply because Ms. Rains agreed to permit Westminster to look at her background, Westminster actually reviewed the civil litigation she was involved with, including the Washington case. Yet Ms. Rains has not disputed Westminster's professed policy to only conduct criminal background checks, not civil ones[209]—other than to argue that because the employee release permitted Westminster to look into civil matters, the school must have done so.[210] But speculation, such as this, cannot defeat a summary judgment motion.[211] In the absence of evidence supporting Ms. Rains' assertion that Westminster and/or Ms. Koerner knew of the Washington case before May 2018, there is no support for the claim that the stated reason for the investigation is false.

Similarly, there is no evidence Ms. Koerner or Westminster acted contrary to any written policy, unwritten policy, or company practice, when deciding to initiate the investigation.[212] All said, Ms. Rains fails to identify facts indicating Westminster's reasons for the investigation are pretextual. Therefore, Ms. Rains has failed to establish

---

[209] (MSJ, SMF ¶ 11, Doc. No. 126; Ex. E to MSJ, Def. Westminster Coll.'s Second Suppl. Resps. to Pl.'s First Set of Disc. Reqs. 6, Doc. No. 126-7.)

[210] (*See* Opp'n 6, 36, Doc. No. 133.) Ms. Rains also argues Westminster "should have known" of the Washington case, even if it did not actually know. (*Id.*; Rains Dep. 43:16–18, Doc. No. 126-5.) But she fails to explain how this applies to pretext. Westminster's explanation might be pretextual if it knew of the case before 2018, but pretext cannot be shown absent this knowledge (it cannot be based on a negligence theory).

[211] *See Bones*, 366 F.3d at 875 ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").

[212] *See Kendrick*, 220 F.3d at 1230.

the existence of a genuine dispute of material fact regarding this issue and cannot rely on the investigation to support her discrimination claim.

### iv.   Termination (Eighth Challenged Action)

The final action Ms. Rains challenges is her termination.[213]  There is no question this was an adverse employment action.[214]  The questions are whether Ms. Rains can show her termination supports an inference of discrimination or that Westminster's explanation for it is pretextual.

#### a.   Inference of Discrimination

As before (with regard to the investigation), Ms. Rains neglects to specifically argue the circumstances surrounding her termination indicate it was motivated by discrimination.  Instead, this notion is an undercurrent in her opposition.  Ms. Rains focuses on her assertion that Westminster's proffered reason for terminating her is pretextual.[215]  Where Ms. Rains makes no attempt to address this factor, she has failed to present evidence sufficient to support a prima facie case of discrimination.

#### b.   Legitimate Nondiscriminatory Reason and Pretext

Even assuming Ms. Rains could establish a prima facie case, Westminster has offered a legitimate nondiscriminatory reason for terminating her: the Washington case.

---

[213] (*See* Opp'n 22, Doc. No. 133 ("[Ms.] Rains was subject to eight adverse employment actions including termination.").)

[214] *See Brown v. Fordyce Concrete Co.*, No. 22-2084, 2023 U.S. Dist. LEXIS 228420, at *34 (D. Kan. Dec. 22, 2023) (unpublished) ("Case law is clear that termination of employment is an adverse action because it is a significant change in employment status.") (citing *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)).

[215] (*See* Opp'n 24–28, Doc. No. 133.)

Where Ms. Rains was found liable for breaching fiduciary duties[216] and violating Washington's Consumer Protection Act,[217] she was subject to termination per the Faculty Manual.[218]  Ms. Rains does not contest that this constitutes a legitimate nondiscriminatory reason for her termination;[219] rather, she asserts the reason is pretextual because Westminster knew of the Washington case before May 2018.

To show Westminster's stated reason is pretextual under *McDonnell Douglas*, Ms. Rains must identify evidence showing Westminster's reason is false, implausible, or fully without merit.[220]  As explained above, while Ms. Rains cites to cases generally discussing methods of demonstrating pretext, she fails to explain if or how those cases apply to her situation.[221]  Again, even affording leniency due to Ms. Rains' pro se status, Ms. Rains' claim—that Westminster's reasons for terminating her were pretextual—fails. Ms. Rains asserts Westminster's stated reason is false because it previously knew of the Washington case, due to the background checks when she was hired and her wage garnishment.  But this assertion fails for all the same reasons outlined above, regarding Ms. Koerner's investigation (Part I.A.iii.b).  Namely, Ms. Rains relies on speculative

---

[216] (*See* MSJ, SMF ¶ 5, Doc. No. 126; Rains Dep. 45:2–13, Doc. No. 126-5.)

[217] (*See* MSJ, SMF ¶¶ 4–5, 43, Doc. No. 126; Rains Dep. 46:1–19, Doc. No. 126-5); *see also Rhodes v. Rains*, No. 79173-7-I, 2020 Wash. App. LEXIS 2085, at *4 (Wash. Ct. App. July 27, 2020) (unpublished).

[218] (*See* MSJ 20, Doc. No. 126); *see also supra* note 77.

[219] (*See* Opp'n 2, Doc. No. 133.)

[220] *See Bennett*, 792 F.3d at 1267.

[221] (*See* Opp'n 24–28, Doc. No. 133.)  It is unclear whether the pretext portion of Ms. Rains' opposition alludes to the investigation, termination, or both, but Ms. Rains challenges Westminster's stated reasons for the termination throughout her brief.

assumptions rather than identifying evidence supporting her assertions.  Ms. Rains fails

to present evidence supporting a finding that Ms. Koerner or any decisionmaker

involved in her termination was aware of the Washington case before May 2018.

c.  Cat's Paw Liability

Ms. Rains also argues discriminatory animus was a motivating factor in her

termination under a "cat's paw" theory of liability.[222]  Under this theory, "an employer

can be liable for the acts of a biased supervisor even if final discipline is imposed by a

seemingly neutral higher authority."[223]  The employer is liable if "a supervisor performs

an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause

an adverse employment action, and if that act is a proximate cause of the ultimate

employment action."[224]  Here, Ms. Rains suggests Ms. Koerner, motivated by

discriminatory animus, "dug up" the Washington case which Westminster used to

terminate her.[225]

As noted above, Ms. Rains has not presented evidence sufficient to support a

finding that Ms. Koerner's investigation was motivated by discriminatory animus.  But

even if she had, her cat's paw theory fails.  This is because

> [a] necessary element to a subordinate bias claim is the decisionmaker's
> uncritical reliance on facts provided by a biased supervisor.  If there is no
> such reliance—that is to say, if the employer independently verifies the facts

---

[222] (*See id.* at 3.)

[223] *Macon v. United Parcel Serv.*, 743 F.3d 708, 715 (10th Cir. 2014).

[224] *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

[225] (Opp'n 24, Doc. No. 133.)

and does not rely on the biased source—then there is no subordinate bias liability.[226]

In this case, Westminster did not uncritically rely on Ms. Koerner's assertions; it independently verified them.  In its termination letter, Westminster noted an independent investigation was conducted after Ms. Koerner's.[227]  And Westminster stated the basis for Ms. Rains' termination was her "conduct as reported by the Washington Court of Appeals" regarding the first jury trial, and "the recent finding by [the second jury] that [Ms. Rains] engaged in an unfair or deceptive act or practice in violation of the Washington State Consumer Protection Act" which "place[d] at risk the College's reputation and affect[ed] the credibility and effectiveness of [Ms. Rains] continuing to serve as an educator at Westminster."[228]

Even if Ms. Rains had identified evidence showing Westminster's independent investigator had improperly relied on Ms. Koerner's report, Westminster based its termination decision in part on the outcome of the second jury trial in August 2018.  That outcome was unknown to Ms. Koerner at the time she submitted her report.  The verdict came months after Ms. Koerner retired.  Where Westminster did not uncritically rely on Ms. Koerner's report without making an independent assessment and decision, it cannot be liable for Ms. Koerner's alleged discriminatory motive.  Ms. Rains has failed to show pretext under this theory.

---

[226] *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1294 (10th Cir. 2013) (internal alterations, citations, and quotation marks omitted).

[227] (*See* Westminster Coll. Emp. Dismissal Letter, Doc. No. 133-10 at 1.)

[228] (*Id.* at 1–2.)

### B. Hostile Work Environment

Ms. Rains also asserts she was subject to a hostile work environment.[229]  But her claim of hostile work environment is unsupported.

 To survive summary judgment under the theory of hostile work environment, Ms. Rains must show (1) "she was a member of a protected group;"[230] (2) "she was subjected to unwelcome harassment;" (3) "the harassment was based on her protected trait(s);" and (4) it was "sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment."[231]  In other words, Ms. Rains must "produce evidence from which a rational jury could infer that she was targeted for harassment because of her" membership in a protected class,[232] such that her workplace was "permeated with discriminatory intimidation, ridicule, and insult" severe enough to alter the conditions of her employment.[233]  Notably, Title VII does not "establish a general civility code for the workplace.  Accordingly, [ ] run-of-the-mill boorish, juvenile, or annoying behavior" does not create a hostile work environment.[234]

---

[229] (Opp'n 4, 8, 18, 20, 28–30, Doc. No. 133.)

[230] *Rodriguez v. Brown*, No. 21-1124, 2022 U.S. App. LEXIS 23002, at *26 (10th Cir. Aug. 18, 2022) (unpublished) (citing *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1170 (10th Cir. 2018)).  It is undisputed Ms. Rains is a member of a protected group.

[231] *Id.* (citing *Payan*, 905 F.3d at 1170).

[232] *Id.* at *26–27 (citing *Sandoval v. Boulder Reg'l Commc'ns Ctr.*, 388 F.3d 1312, 1327 (10th Cir. 2004)).

[233] *Payan*, 905 F.3d at 1171 (citation omitted).

[234] *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir. 2012) (internal citations and quotation marks omitted).

Ms. Rains cannot make a case for hostile work environment because she has not identified facts showing any alleged discrimination was related to her status as a woman or as a non-LDS faculty member.  Nor has Ms. Rains shown any harassment was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.[235]  As shown by cases where more direct conduct was still deemed insufficient to create a hostile work environment, Ms. Rains has not established a genuine dispute of material fact exists as to these issues.

For example, in *Defrietas v. Horizon Investment & Management Corp.*,[236] a Catholic plaintiff based a hostile work environment claim on her religious status, alleging the following facts:

- Plaintiff was a Catholic in a predominately Mormon-run company, with all Mormon supervisors;

- Plaintiff felt compelled to join in religious conversations during work hours;

- someone said returned Mormon missionaries were "good salespeople" and "good hires";

- upon Plaintiff's return to work after maternity leave, this same person noted "most good Mormon girls stay at home with their children"; and

- before a surgery, another coworker offered Plaintiff a Book of Mormon and a blessing.[237]

---

[235] *See Payan*, 905 F.3d at 1171.

[236] No. 2:06-cv-926, 2008 U.S. Dist. LEXIS 5317 (D. Utah Jan. 24, 2008) (unpublished).

[237] *Id.* at *20.

The district court concluded these instances did not amount to discriminatory intimidation, ridicule, or insult sufficient to alter the plaintiff's employment conditions or create an abusive environment.[238]  The court noted the plaintiff never alleged she was ridiculed at work, and the statements, though "insulting," "were sufficiently isolated that a reasonable juror could not conclude they pervaded Plaintiff's work place."[239]  Finally, the plaintiff presented "no evidence she was intimidated or ridiculed because of her faith"; instead, she endured only ordinary workplace tribulation."[240]

Next, in *Milam v. Pafford EMS*[241] the plaintiff asserted he was subjected to a hostile work environment based, in part, on his Jewish faith.[242]  Among other things, coworkers told the plaintiff they overheard others referring to him as a "f—ing Jew" and conspiring to have him fired.[243]  Another time, a supervisor said, "don't pull the Jew card on me" when the plaintiff discussed his work availability on the Sabbath.[244]  The Tenth Circuit reasoned that even if both comments were made with discriminatory animus, they were isolated events not amounting to pervasive or severe harassment.[245]  Although the plaintiff also asserted several other incidents in support of his claim, the

---

[238] *Id.* at *20–21.

[239] *Id.*

[240] *Id.* at *21.

[241] 729 F. App'x 632 (10th Cir. 2018) (unpublished).

[242] *Id.* at 634.

[243] *Id.* at 637.

[244] *Id.*

[245] *Id.*

court explained that while "facially neutral abusive conduct can support a finding of [discriminatory] animus" when "viewed in the context of other, overtly . . . discriminatory conduct," under the circumstances, the plaintiff's reported events did not support such a finding.[246]

Much like the plaintiffs in *Defrietas* and *Milam*, Ms. Rains has failed to identify evidence from which a rational jury could conclude she was harassed because of her gender or religious status, nor has she proffered evidence showing any harassment was severe or pervasive.  In her opposition, Ms. Rains asserts that after Ms. Koerner became interim dean, Ms. Rains was subjected to "a severe and pervasive hostile work environment" in the form of "heightened scrutiny as to every aspect of her work" and "higher performance standards" than male faculty members or members of the LDS church.[247]  She alleges LDS department members were "distant, at best, and at worst . . . instrumental in creating the hostile work environment."[248]  According to Ms. Rains, "the cultural norm at Westminster (the unwritten rules for women to follow) put her between a rock and hard place as a professor" and "contributed to the hostile work environment."[249]  Ms. Rains contends she was "expected to maintain a meek personality and not to speak up or disagree with . . . any members of the department, especially the men,"[250] and her male LDS mentor suggested she might avoid "future

---

[246] *Id.* at 637–38 (alterations in original) (citation omitted).

[247] (Opp'n 8, Doc. No. 133.)

[248] (*Id.* at 9.)

[249] (*Id.* at 20.)

[250] (*Id.* at 8.)

adverse treatment if she stayed quiet during meetings."[251]  As an example, Ms. Rains

explains a male LDS colleague—who "had a reputation on campus for biased treatment

of women,"[252] spoke to Ms. Rains in a "verbally violent way" at a meeting.[253]  According

to Ms. Rains, witnesses reported the incident "to the Chief Diversity Officer of

Westminster and an investigation ensued,"[254] but Ms. Rains was not "contacted or

questioned as part of the investigation."[255]  (Ms. Rains cites to an email chain in support

of her claim, but the emails refute Ms. Rains' claim that an investigation was

commenced, and the biased individual is unidentified.)[256]

 Ms. Rains provides little to no support for her claim of hostile work environment,

and her examples are foundationally inadequate.  An independent review of Ms. Rains'

---

[251] (*Id.* at 9.)  Ms. Rains offers no evidence the individual was alluding to her protected class when he made the statement, such that a reasonable person would believe it was based on her status as a woman or nonmember of the LDS church.  When asked whether she was advised to remain quiet "because you're a woman or you're not a member of the LDS church," Ms. Rains responded with conclusory generalities rather than answering the question.  (*See* Rains Dep. 126:10–22, Doc. No. 126-5.)

[252] (Opp'n 17, Doc. No. 133.)  Ms. Rains identifies no evidence supporting this statement.

[253] (Rains. Decl. ¶ 44, Doc. No. 134.)  This isolated incident is insufficient to establish Ms. Rains was subject to a hostile work environment based on her sex.

[254] (Opp'n 17, Doc. No. 133.)

[255] (*Id.*)

[256] (*See* Ex. Q to Opp'n, Email Chain between Marco Barker and Emily Sharp Rains, Doc. No. 133-14 at 1 ("Although the bias response team can assist people in determining whether a violation of law or college policy may have occurred, we cannot investigate, initiate disciplinary action, or impose sanctions that are policy violations.").)

deposition and declaration[257] reveals no evidence supporting her assertion that the alleged instances of harassment occurred because of her gender or religion—or that they are sufficiently egregious, severe, or pervasive to establish a hostile work environment.  For example, Ms. Rains claims Ms. Koerner targeted women[258] and harassed her for not "dumb[ing] down the curriculum," whereas another colleague was not questioned.[259]  In another instance, Ms. Rains claims Ms. Koerner harassed her by having the female LDS individual she selected as department chair oversee Ms. Rains' business law course, despite her lack of legal experience.[260]  Ms. Rains asserts this was "just another one of [Ms. Koerner's] ways to micromanage me and control me."[261]  Ms. Rains also claims Ms. Koerner routinely "interfered" with student, collegiate, and professional relationships.[262]

---

[257] (*See* Rains Dep., Doc. No. 126-5; Rains Decl., Doc. No. 134); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").  While Ms. Rains has some leeway as a pro se litigant, the court will not comb through all the evidence to support her arguments.  *See Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (noting "it is the responding party's burden to ensure the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record" (alteration in original) (citation omitted)); *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000) (noting a district court is "not obligated to comb the record in order to make [the plaintiff's] arguments for [her]").

[258] (*See* Rains Dep. 71:14, Doc. No. 126-5.)

[259] (*Id.* at 113:4–5, 114:3–10.)

[260] (*Id.* at 145:8–23, 146:13–16, 148:5–8.)

[261] (*Id.* at 146:15–16.)

[262] (*Id.* at 158:1–159:15.)  Ms. Rains' other allegations of harassment likewise fall short of a hostile work environment—either because they do not relate her protected classes or are insufficiently pervasive or severe.  (*See, e.g.*, *id.* at 163:16–21; 166:4–5, Doc. No. 126-5 (alleging a colleague commented on her focus on teaching law versus

Even if Ms. Rains had supported these assertions with evidence, they lack connection to Ms. Rains' protected status and do not reveal pervasive or severe harassment.[263] "On balance, there is simply insufficient evidence for a jury to find that the alleged harassment was pervasive."[264]  Therefore, Ms. Rains has failed to establish genuine disputes of material fact exist preventing judgment in Westminster's favor as a matter of law as to her claim of a hostile work environment.

All told, Ms. Rains has failed to support her claim that she suffered discrimination at the hands of Westminster or Ms. Koerner under any theory.  Accordingly, Westminster is entitled to summary judgment on the discrimination portion of her Title VII claim.

II.  Retaliation

Ms. Rains initially asserted Westminster terminated her in retaliation for protected activity.[265]  In response to Westminster's argument that it terminated her based on the outcome of the Washington case and not for complaining about discrimination,[266] Ms.

---

accounting, and she "considered that a form of harassment"); *id.* at 166:22–167: 5 (asserting this same comment "was harassment because he and [Ms.] Koerner had some kind of demented interaction where they were trying to find fault with everything I did," not because the colleague was unqualified to provide that feedback); *id.* at 172:25–173: 6 (alleging that having to go through three contract reviews "was another form of harassment").)

[263] *See Morris*, 666 F.3d at 664.

[264] *Id.* at 666.

[265] (Compl. ¶ 65, Doc. No. 62.)

[266] (*See* MSJ 22, Doc. No. 126.)  Westminster's initial argument regarding this issue is relatively short.  (*See id.*)  And while the word "retaliation" is not used, Westminster notes it terminated Ms. Rains after the Washington case resolved with a finding of liability, and "[t]here is no evidence to the contrary."  (*See id.*)  Where a movant does not

Rains instead argues Westminster's failure to investigate her discrimination complaint amounts to retaliation and Westminster failed to "proffer a legitimate reason for the failure to investigate."[267]  This new argument raises the question of which retaliation claim the court should consider.

Where a plaintiff presents new theories in response to summary judgment motions, she "should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover," so long as "a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."[268]  However, "the liberalized pleading rules [do not] permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case," as this practice would waste party and judicial resources.[269]

In *Evans v. McDonald's Corp.*,[270] the Tenth Circuit found no fault with a district court's decision not to address a theory first presented in response to a summary judgment motion "two weeks before the scheduled trial date."[271]  The court noted the

---

[267] (*See* Opp'n 32, Doc. No. 133.)

[268] *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991) (quoting 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1219 at 194 (1990)).

[269] *Id.* at 1091.

[270] 936 F.2d 1087.

[271] *Id.* at 1091.

new theory was "sufficiently unique" that the "late shift in theories caused substantial prejudice" to the defendant.[272]  Even considering Ms. Rains' new theory in addition to her original retaliation theory, her claim is unsupported.

Construed favorably to Ms. Rains, the basic facts underlying each retaliation theory are the same: during the May 9, 2018 meeting with Ms. Koerner and the provost, Ms. Rains complained Ms. Koerner discriminated against Ms. Rains[273] because of her gender.[274]  Later, in August, Ms. Rains asked for an update on the investigation into her complaint and learned the provost had done nothing because Ms. Rains had failed to submit the complaint in writing.[275]  Two days after that meeting, when Westminster's human resources director contacted Ms. Rains to follow up on the complaint, Ms. Rains accused Westminster's administration of operating on a "level of collusion" and stated she had "taken her complaint to the EEOC."[276]

In the retaliation context, it is "unlawful for an employer to discriminate against an employee because [she] has opposed any practice made an unlawful employment practice by Title VII."[277]  Under the *McDonnell Douglas* framework (in absence of direct

---

[272] *Id.*

[273] (Opp'n 32, Doc. No. 133.)

[274] (Rains Dep. 72:15–17, Doc. No. 126-5.)

[275] (Opp'n 32, Doc. No. 133.)

[276] (Ex. 4 to Rains Decl., Email Chain between Julie Freestone and Emily Sharp Rains, Doc. No. 134-4 at 1; *see also* Ex. I to MSJ, (same), Doc. No. 127-4.)

[277] *Oldridge v. City of Wichita*, No. 22-3104, 2023 U.S. App. LEXIS 14658, at *9 (10th Cir. June 13, 2023) (unpublished) (alterations and internal quotation marks omitted) (quoting 42 U.S.C. § 2000e-3(a)).

evidence of retaliation), a plaintiff must establish a prima facie claim of retaliation by "plausibly alleging (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[278]  Once an employee establishes a prima facie claim, the burden shifts to the employer to assert a legitimate nonretaliatory reason for the action.[279]  If the employer posits a nonretaliatory reason, the employee must show the employer's reason is pretext for retaliation[280] and "that the desire to retaliate was the but-for cause of the challenged employment action."[281]

At the outset, Ms. Rains fails to support her conclusory assertion that she "established the prima facie elements of a retaliation claim," because she skips over those elements in favor of addressing pretext.[282]  Even if Ms. Rains had addressed the elements of a prima facie case, she could not show a failure to investigate constitutes an adverse employment action, even in the retaliation context.  And she is unable to identify facts showing Westminster's explanation for terminating her was pretextual.  For these reasons, Westminster is entitled to summary judgment under both retaliation theories.

---

[278] *Rodriguez*, 2022 U.S. App. LEXIS 23002, at *31 (alterations and internal quotation marks omitted) (quoting *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021)).

[279] *Id.* (citing *Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 994 (10th Cir. 2021)).

[280] *Id.*

[281] *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

[282] (*See* Opp'n 32, Doc. No. 133.)

To establish the first element of the prima facie case, Ms. Rains must show her report of discrimination amounted to protected opposition.  "Protected opposition can range from filing formal charges to voicing informal complaints to superiors."[283]  "[N]o magic words are required," but "to qualify as protected opposition the employee must convey to the employer [their] concern that the employer has engaged in a practice made unlawful by [Title VII]."[284]  Further, a plaintiff need not show actual discrimination, only that she "had a reasonable good-faith belief that the opposed behavior was discriminatory."[285]  Resolving the disputed facts in Ms. Rains' favor, and assuming she complained Ms. Koerner discriminated against her based on her gender, her statement constitutes protected activity.[286]

In the next step, Ms. Rains must show she suffered a materially adverse action. In a retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning it "might have dissuaded a

---

[283] *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

[284] *Oldridge*, 2023 U.S. App. LEXIS 14658, at *9 (second alteration in original) (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)).

[285] *Hertz*, 370 F.3d at 1016.

[286] *See Dean v. Comput. Scis. Corp*, 384 F. App'x 831, 839 (10th Cir. 2010) (unpublished) (concluding a plaintiff's verbal allegation of harassment and discrimination based on her race and gender "sufficiently conveyed a concern" under Title VII, and emails indicating she might file an EEOC complaint "may also have been sufficient to qualify as protected opposition" when coupled with her previous oral statement); *cf. Hayes v. Best Brands Corp.*, No. 10-2581, 2011 U.S. Dist. LEXIS 95707, at *7 (D. Kan. Aug. 26, 2011) (unpublished) (finding a retaliation claim failed because, while the plaintiff complained "he felt discriminated against, . . . he did not know why" and neglected to "specifically complain of gender discrimination").

reasonable worker from making or supporting a charge of discrimination."[287]  With regard to Ms. Rains' claim that Westminster failed to investigate, "[c]ourts across the country have routinely held that 'the failure to conduct an adequate investigation . . . cannot be . . . considered an action that reasonably would deter an employee from engaging in the protected activity under Title VII.'"[288]  Here, the question is more subtle: whether failure to commence an investigation *at all* would dissuade a reasonable worker from engaging in protected activity.  In light of the legal authority indicating an inadequate investigation is insufficient to constitute retaliation, there is no reason to think a failure to investigate would dissuade a reasonable employee from reporting discrimination.  Accordingly, the analysis stops here for Ms. Rains' retaliation-by-failing-to-investigate theory.  It fails as a matter of law.

Regarding Ms. Rains' termination theory of retaliation, there is no question termination is a materially adverse action.[289]  Accordingly, Ms. Rains must next show the termination was causally connected to her protected activity of reporting.[290]  The time between Ms. Rains' report and termination "is key to this inquiry because the closer [the termination] occurred to the protected activity, the more likely it will support a

---

[287] *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

[288] *Haws v. Draper City,* No. 2:20-cv-00091, 2023 U.S. Dist. LEXIS 49936, at *30 (D. Utah Mar. 22, 2023) (unpublished) (quoting *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1069 (N.D. Cal. 2011)).

[289] *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1216 (10th Cir. 2003) (noting "it hardly requires stating" that termination is a materially adverse action for purposes of a Title VII retaliation claim).

[290] *Rodriguez*, 2022 U.S. App. LEXIS 23002, at *32.

showing of causation."[291]  For instance, a period of six weeks between protected activity

and adverse action may, by itself, establish causation,[292] but a three-month period is

insufficient.[293]  Construing the date Ms. Rains last reported discrimination (August 24,

2018), as the latest date of protected activity, Ms. Rains was terminated on October 18,

2018,[294] nearly two months later.  Even assuming this creates a causal connection such

that Ms. Rains can make out a prima facie case of retaliation, Ms. Rains has not

identified facts showing Westminster's nonretaliatory reason for terminating her (the

outcome of the Washington case) was pretextual.  As discussed in depth in Parts

I.A.iii.b. and I.A.iv.b. above, Ms. Rains has not pointed to evidence showing

Westminster or Ms. Koerner knew of the Washington case before 2018, such that its

claimed basis for terminating her was false.  In other words, Ms. Rains cannot support

her retaliation claim.

Where Ms. Rains has failed to support her discrimination and retaliation claims

under Title VII, Westminster is entitled to summary judgment on Ms. Rains' fourth cause

of action—her only federal claims.

III.  Ms. Rains' Remaining Claims and Motion for Partial Summary Judgment

Because Ms. Rains' Title VII claims cannot survive summary judgment, this court

should decline to exercise supplemental jurisdiction over her remaining claims, which all

---

[291] *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

[292] *See id.* (citing *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir.
1991)).

[293] *See id.* (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997).

[294] (*See* Westminster Coll. Emp. Dismissal Letter, Doc. No. 133-10.)

arise under state law.[295]  Westminster and Ms. Koerner's motion for summary judgment should be denied as moot as to these state-law claims.  Similarly, where Ms. Rains' partial motion for summary judgment addresses only these state-law claims,[296] it should be denied as moot.

Ms. Rains fails to assert any basis for original subject-matter jurisdiction over any of her remaining claims.[297]  For instance, Ms. Rains has not alleged facts sufficient to establish diversity jurisdiction; while she seeks more than $300,000 in damages, she has not alleged diversity of citizenship.[298]  If the recommendation to dismiss Ms. Rains' Title VII claims is adopted, the court should decline to exercise supplemental jurisdiction over Ms. Rains' remaining claims[299] and dismiss them without prejudice.  Westminster and Ms. Koerner's motion for summary judgment should be denied as moot as to these state-law claims.  Moreover, Ms. Rains' motion for partial summary judgment[300] should be denied as moot because it only addresses these same state-law claims.

---

[295] (*See* Compl. ¶¶ 77–97, 103–132, Doc. No. 62.)

[296] (*See* Pl.'s Partial Mot. for Summ. J, Doc. No. 128.)

[297] Because Ms. Rains' remaining claims arise solely from state law, they must be brought in state court unless a federal court has a basis to exercise jurisdiction over them (such as diversity or supplemental jurisdiction).  *Cf. Fletcher v. Summit Food*, No. 18-cv-1220, 2020 U.S. Dist. LEXIS 75194, at *8 (D.N.M. Apr. 29, 2020) (unpublished) ("To the extent the Complaint raises any state law claims for . . . torts, those claims will be dismissed without prejudice.  Plaintiff must re-file those claims in [state court] . . . .").

[298] *See* 28 U.S.C. § 1332(a) (requiring complete diversity among parties *and* an amount in controversy exceeding $75,000).

[299] *See Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

[300] (Pl.'s Partial Mot. for Summ. J. Doc. No. 128.)

**RECOMMENDATION**

Because Ms. Rains has not identified facts sufficient to establish the elements of a claim for discrimination or retaliation under Title VII, the undersigned recommends:

- Westminster and Ms. Koerner's motion for summary judgment[301] be granted in part, and judgment entered in favor of Westminster on Ms. Rains' fourth cause of action (her Title VII claims against Westminster);

- Ms. Rains' remaining state-law claims be dismissed without prejudice due to a lack of original subject-matter jurisdiction; and

- Westminster and Ms. Koerner's motion for summary judgment[302] be denied as moot as to Ms. Rains' remaining state-law claims;

- Ms. Rains' motion for partial summary judgment[303] be denied as moot, as it only addresses the remaining state-law claims which should be dismissed.

The court will send copies of this report and recommendation to all parties, who are notified of their right to object to it.  Any objection must be filed within fourteen days

---

[301] (MSJ, Doc. No. 126.)

[302] (*Id.*)

[303] (Pl.'s Partial Mot. for Summ. J., Doc. No. 128.)

of service.[304]  Failure to object may constitute waiver of objections upon subsequent review.

DATED this 8th day of July, 2024.

BY THE COURT:

_Daphne A. Oberg_
Daphne A. Oberg
United States Magistrate Judge

---

[304] *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).